Filed 1/10/17 Unmodified opinion attached

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HEALTHSMART PACIFIC, INC., et al., | B264300 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC566549) |
| v. | ORDER MODIFYING THE OPINION (NO CHANGE IN THE JUDGMENT) |
| BRIAN S. KABATECK et al., | |
| Defendants and Respondents. | |

THE COURT:

On the court's own motion, the opinion filed in the above-entitled matter on December 19, 2016, shall be modified in the following manners:

On page 20, in the first full paragraph, the third sentence is deleted and replaced with the following sentence:

Plaintiffs also compare Drobot's admission that he bribed Senator Calderon in various ways that did not involve prostitutes with the suggestion that Drobot was involved in supplying prostitutes as bribes or kickbacks.

On page 21, the sentence beginning on line 7 is deleted and replaced with the following sentence:

More particularly, the attorney defendants in this case are protected from liability under the fair report privilege in informing the news media

that they have alleged that plaintiffs used counterfeit screws in spinal surgeries and were part of a scheme that supplied prostitutes, but they are not protected if they informed the media that such facts were true.

These modifications do not constitute a change in the judgment.

_____
ROTHSCHILD, P. J.          JOHNSON, J.          LUI, J.

Filed 12/19/16; pub. order 1/10/16 (see end of opn.) Unmodified opinion

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HEALTHSMART PACIFIC, INC. et al., | B264300 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC566549) |
| v. | |
| BRIAN S. KABATECK et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County. Richard E. Rico, Judge. Affirmed.

Horvitz & Levy, Jeremy B. Rosen, John F. Querio; Keith A. Fink & Associates, Keith A. Fink, and Olaf J. Muller for Plaintiffs and Appellants.

Buchalter Nemer, Harry W.R. Chamberlain II, Robert M. Dato, and Efrat M. Cogan for Defendants and Respondents.

_____

Plaintiffs Michael D. Drobot and Healthsmart Pacific, Inc. sued certain lawyers and their law firms for defamation and other causes of action arising from statements two of the lawyers made on television and radio programs about a pending lawsuit. The attorney defendants filed a special motion to strike the complaint as a strategic lawsuit against public participation, or SLAPP. (Code Civ. Proc., § 425.16.) The court granted the motion and awarded the attorney defendants their fees and costs. Plaintiffs appealed. Reviewing the matter de novo, we conclude that the action arises out of activity protected under the anti-SLAPP statute and, because the challenged statements are protected under the fair report privilege, plaintiffs have not established a probability of success on the merits of their claims. We therefore affirm the trial court's order.

## FACTUAL AND PROCEDURAL SUMMARY

A.     *Background; Drobot's Plea Agreement*

Drobot owns and operates Healthsmart Pacific Inc. (Healthsmart), which owned and operated Pacific Hospital of Long Beach (Pacific Hospital) from approximately 1995 until October 2013. Pacific Hospital specialized in performing spinal surgeries.

In February 2014, Drobot pled guilty in federal court to charges of conspiracy to violate certain federal statutes (18 U.S.C. § 371)[1] and paying kickbacks in connection with a federal health care program (42 U.S.C. § 1320a-7b(b)(2)(A).)[2] According to his plea agreement, Drobot

---

[1] Title 18 U.S.C. section 371 makes it a crime to conspire with another "to commit any offense against the United States, or to defraud the United States, or any agency thereof," and to have any member of the conspiracy "do any act to effect the object of the conspiracy." The federal offenses Drobot conspired to violate are: mail fraud (18 U.S.C. § 1341); honest services mail fraud (18 U.S.C. § 1346); interstate travel in aid of a racketeering enterprise (18 U.S.C. § 1952(a)(3)); money laundering (18 U.S.C. § 1957); and payment of kickbacks in connection with a federal health care program (42 U.S.C. § 1320a-7b(b)(2)(A)).

[2] Title 42 U.S.C., section 1320a-7b(b) provides: "(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback,

"provided a stream of financial benefits to California State Senator Ronald S. Calderon" to influence Senator Calderon to support legislation and regulations that allowed hospitals "to 'pass through' to workers' compensation insurance carriers the cost of medical hardware used in spinal surgeries."[3]  These financial benefits included payments to Senator Calderon's son for work as a summer file clerk, taking Senator Calderon to "exclusive, high-end golf resorts" and "expensive dinners," and providing the senator with "free flights on a private plane."  Drobot took advantage of the legislation Senator Calderon supported by having Pacific Hospital purchase medical hardware from Drobot's company, International Implants, LLC, at "fraudulently inflate[d]" prices, then passing the cost on to insurance carriers. Although International Implants did not manufacture the hardware, its invoices for the hardware included a stamp indicating that it "was an 'FDA Registered Manufacturer.' "

Drobot further admitted that for approximately 15 years he participated in a conspiracy involving "kickbacks" to "dozens of doctors, chiropractors, marketers, and others . . . in return for those persons to refer thousands of patients to Pacific Hospital for spinal surgeries and other

---

bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— [¶] (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a [f]ederal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a [f]ederal health care program, shall be guilty of a felony."

[3]  Although not specified in the plea agreement, the referenced legislation apparently included former Labor Code section 5318, subdivision (a), which was amended in 2003 to provide:  "Implantable medical devices, hardware, and instrumentation for [certain medical services] shall be separately reimbursed at the provider's documented paid cost, plus an additional 10 percent of the provider's documented paid cost, not to exceed a maximum of two hundred fifty dollars ($250), plus any sales tax and shipping and handling charges actually paid."  (Stats. 2003, ch. 639, § 44, p. 4933.)  This statute was repealed in 2012.  (Stats. 2012, ch. 363, § 78.)

medical services." The kickbacks to surgeons were larger if the surgeon used the hardware supplied by International Implants. From 2008 to 2013, Drobot paid between $20 million and $50 million in kickbacks, resulting in "several thousand spinal surgeries" at Pacific Hospital.

Neither the charging pleading in the federal criminal case nor Drobot's plea agreement referred to anyone making, purchasing, or using any counterfeit or non-FDA approved medical hardware. Nor did any documents refer to anyone supplying prostitutes or adult entertainers to anyone.

B.    *The Cavalieri Complaint*

In 2010, Mary Cavalieri underwent two spinal surgeries at Pacific Hospital. On July 17, 2014, the attorney defendants filed a complaint in the superior court on Cavalieri's behalf against Drobot, Healthsmart, and others (the Cavalieri complaint).[4] The Cavalieri complaint alleged the following: Drobot "bribed and influenced legislators in Sacramento to pass . . . legislation" that allowed him and other defendants "to force [insurance] carriers and others to pay whatever artificial fraudulent sum was listed on the bills" for spinal surgeries. Drobot used International Implants, which was a " 'sham' distributorship" of spinal surgery hardware, to "artificially and falsely increase the cost of the . . . hardware." Drobot conspired with others to pay "illegal kickbacks" to induce referrals for surgery at various hospitals. The kickbacks—which included cash, air travel, "and prostitutes or other 'adult entertainers' "—"ensure[d] the flow of spinal fusion surgery patients, all in furtherance of the conspiracy to defraud insurance carriers." The scheme was "publicly exposed" when Drobot entered into his plea agreement in federal court and admitted to bribing politicians, paying kickbacks for referrals, and using International Implants to inflate the price of medical hardware to support fraudulent claims to insurers.

The Cavalieri complaint further alleged that, in addition to bribing legislators, inflating medical hardware prices, and paying illegal kickbacks, Drobot and other conspirators used "counterfeit, non-FDA approved,

---

[4] The attorney defendants are individuals Brian S. Kabateck and Robert B. Hutchinson, and the law firms Kabateck Brown Kellner LLP, Cotchett, Pitre & McCarthy LLP, and Knox Ricksen LLP.

4

'knock-off' " medical hardware, which they "implanted into thousands of patients, including [Cavalieri]," with "conscious disregard for the health, safety and well-being of the patients." The allegedly counterfeit hardware was produced by Crowder Machine & Tool Shop in Temecula, California. Cavalieri alleged that she "now suffers from having foreign objects in her spine, the origin or provenance of which cannot be identified and the safety and efficacy of which cannot be measured due to the extremely egregious conduct of the [d]efendants." She asserted numerous causes of action, including battery, fraud, breach of fiduciary duty, strict products liability, breach of express and implied warranties, unjust enrichment, negligent and intentional infliction of emotional distress, and negligence.[5]

C.    *Kabateck's Statements On Fox 11 News*

On July 24, 2014, one week after the Cavalieri complaint was filed, Fox 11 television news aired a report that included excerpts of an interview with one of Cavalieri's lawyers, defendant Brian Kabateck. Fox 11 posted the report on its website. In the approximately four and one-half minute report, the Fox 11 reporter identifies Kabateck as Cavalieri's attorney in a lawsuit, which alleges that medical devices were "implanted in [Cavalieri's] body as part of a scam to illegally profit from insurance companies [and] California taxpayers." The report alternates between scenes of Kabateck speaking to a person off-camera, images of the complaint, video of persons and places referred to in the story (such as Senator Calderon and Pacific Hospital's former facility), and the reporter speaking to the camera.

---

[5] Other plaintiffs subsequently filed complaints against Drobot alleging similar facts and causes of action. Most of the lawsuits were filed by people who had surgery at hospitals other than Pacific Hospital. Drobot successfully demurred to the complaints of three such lawsuits and 27 other lawsuits were subsequently dismissed voluntarily. Drobot thereafter filed a verified complaint for malicious prosecution against the 30 plaintiffs and their attorneys, including the attorney defendants in this case. The attorney defendants in that malicious prosecution case filed an anti-SLAPP motion, which the court granted. Drobot appealed. That appeal, *Healthsmart Pacific, Inc., et al. v. Golia, etc., et al.*, case No. B266311, is pending.

Kabateck begins by stating: "Basically what was happening here was, the hospitals we alleged in the complaint and the doctors were conspiring together to install effectively counterfeit hardware in people's backs." The reporter continues: "According to the complaint, Cavalieri was told she needed a spinal fusion, and had the surgery in 2010." Kabateck then states, "[i]t didn't work and she went and had to have another surgery and finally ended up with a legitimate, genuine doctor who was trying to help her[,] and this doctor found out that she had counterfeit hardware installed in her back."

"At the center of this," Kabateck continues, "is an individual named Michael Drobot who has already pled guilty to a number of counts of insurance fraud." At this point, the reporter states, "you may recognize the name. In February Drobot admitted to bribing California State Senator Ron Calderon." In addition to such bribes, the reporter discussed Drobot's admission to "paying kickbacks to doctors who funneled patients to his hospital." Kabateck then states: "There's evidence here that there were lavish trips on private jets, that there were prostitutes, that there were large amounts of kickbacks that were going on all to drive patients in the doors."

An image of the caption of the Cavalieri complaint then fills the television screen as the reporter states: "In this civil lawsuit, Mary Cavalieri claims she was a victim of the alleged scheme, and adds the explosive allegation that knock-off devices were implanted in her spine." Kabateck adds: "These parts were being made in a machine shop in Temecula. They weren't FDA supervised, they weren't necessarily clean, and they may not even be the right material." The reporter identifies Crowder Machine & Tool as the Temecula machine shop named "in the lawsuit as the maker of the devices." The reporter continues: "Here's the allegation: Crowder would make a $65 screw in the machine shop. Keep in mind an FDA-approved screw wholesales for about $400. But by the time the same screw was used in a hospital, insurers were billed over $12,000." Kabateck adds: "They were fabricating the costs, they were billing the insurance companies and as a result of it, they were receiving millions of dollars."

The reporter states that she contacted Drobot's attorney, who said that "the lawsuit is completely unfounded, that the hardware was purchased from

6

an FDA-approved manufacturer, and that they have the documentation. But Cavalieri's attorneys say in the complaint that the defendants lied to the FDA and used the political system to benefit." Kabateck adds that "there's certainly connections here between legislation that had been passed, legislation that had been authored or championed by Senator Calderon and Michael Drobot. But what we know is that this legislation was the vehicle, it was the mechanism by which they were able to perpetuate the fraud."

An image of the Cavalieri complaint is shown again as the reporter described the allegations that Senator Calderon and Tom Calderon accepted kickbacks and extravagant trips to support legislation to further the conspiracy. The reporter adds: "Again, from the complaint, between 2001 and 2012, Pacific [Hospital] performed at least 5,000 spinal fusions. One of those patients is Mary Cavalieri, but her attorney fears there are many, many more." Kabateck concludes: "We don't know how many thousands and thousands of people in the greater Los Angeles area or frankly in California as a whole who fell victim to this."

D. *Hutchinson's Statements On CBS Radio*

On August 12, 2014, defendant Robert Hutchinson participated in a CBS radio program called "Money 101," hosted by Bob McCormick. The following colloquy took place.[6]

"McCormick: A massive medical fraud lawsuit has been filed against several Southern California hospitals and doctors.

"[Hutchinson]: 'It's just a concern knowing that non-FDA approved hardware is in your spine without knowing whether it can cause infection.'"

---

**6** Hutchinson provided a declaration affirming that the words attributed to him in the CBS radio program are "my words." He stated, however, that the recorded program included "excerpted snippets from the interview" and "[t]here is no way to tell . . . if any of the questions and statements immediately followed one another, or what other intervening material was removed."

"McCormick:  Attorney Robert Hutchinson says they are alleging that insurance companies were defrauding . . . when these phony medical devices were billed at outrageously high prices.

"[Hutchinson]:  'One of the ways they did that was to have a machine shop in Temecula manufacture spinal hardware used in spinal fusion surgeries.  These were knock-offs.' "

"McCormick:  That's because the FDA has only approved devices from two companies.

"[Hutchinson]:  'And these devices are screws that usually sell for a few hundred dollars each and we found in our investigation that insurance companies were being billed thousands of dollars for these counterfeit devices.' "

"McCormick:  The lawsuit alleges a complicated scheme of sham distributors and kickbacks that were paid to doctors.

"[Unidentified]:  'This may be the biggest medical fraud case in the history of the country.' "

"McCormick:  And that's what legal commentator Emory Ledger says about this [S]outhern California case."

Following a commercial break in the program, the program continued:

"McCormick:  Hospitals, doctors, and scam [artists] have been named in a massive medical fraud lawsuit involving counterfeit hardware that was used in spinal fusion surgery.

"[Hutchinson]:  'Patients had counterfeit or knock off screws that were not FDA approved used in their spinal fusion cases and the insurance companies were billed enormous amounts of money over and above what would have been the normal charges had they used FDA approved hardware.' "

"McCormick:  Attorney Robert Hutchinson alleges that the surgeries were conducted at Tri-City Hospital, Riverside Community, Pacific Hospital of Long Beach, and others.

"[Hutchinson]:  'Well, we alleged that doctors actually knew that they were using counterfeit screws and agreed to do it and they were getting kickbacks from the hospitals and some of the marketers to bring their patients to the hospitals involved and use the counterfeit screws and that's

8

what provided the cash flow which in turn was—we alleged delivered that many of these doctors in the form of kickbacks.' "

"McCormick: They alleged that the insurance companies were billed over [$]500 million . . . in the scheme."

E.   *Drobot's Complaint And The Attorney Defendants' Anti-SLAPP Motion*

On December 14, 2014, plaintiffs filed a complaint against the attorney defendants, asserting causes of action arising from the statements Kabateck made during the Fox 11 news report and the statements Hutchinson made on the CBS radio program. In essence, plaintiffs alleged that Kabateck and Hutchinson falsely stated or implied: Plaintiffs were involved in a "scheme[] to . . . purchase and use cheap counterfeit screws for . . . spinal surgery patients"; the counterfeit, non-FDA-approved screws, which were manufactured by a machine shop in Temecula, could cause infections and seriously harm the patients; Pacific Hospital physicians inserted such counterfeit screws, which may not have been clean or sterilized, into Cavalieri's spine; the scheme may have resulted in many thousands of victims; the counterfeit screw scheme is related to the federal charges involving a physician referral kickback scheme to which Drobot pled guilty and involved the hiring of prostitutes.

Plaintiffs alleged that the attorneys' statements were false and that neither they nor Pacific Hospital ever purchased or used any counterfeit or non-FDA-approved screws or related parts in spinal surgeries, and never failed to sterilize screws or other parts used in spinal surgeries. They further alleged that they never participated in any scheme regarding counterfeit screws or related parts, never bribed any governmental officials in connection with such a scheme, and never hired or paid prostitutes "as part of any counterfeit screw scheme or other such scheme."

The attorney defendants, plaintiffs contend, knew or should have known that their statements were false, and, by making them, not only caused them harm, but "have needlessly created incredible hysteria for hundreds of former patients" of Pacific Hospital. Plaintiffs further alleged that the false and defamatory statements have caused harm and interfered with their existing and prospective economic relations with health insurers

9

and others.  The statements also constitute "unfair business acts" and "false advertising" for purposes of the unfair competition law.  (Bus. & Prof. Code, § 17200 et seq.)

In January 2015, the attorney defendants filed a special motion to strike the complaint under Code of Civil Procedure section 425.16, the anti-SLAPP statute, and Drobot filed an opposition.

After a hearing, the trial court granted the motion and awarded the attorney defendants $64,450 in attorney fees and costs.  Plaintiffs appealed.

## DISCUSSION

"A SLAPP suit is a meritless suit 'filed primarily to chill the defendant's exercise of First Amendment rights. ' " (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 861.)  In order "to protect the valid exercise of [these rights] from the abuse of the judicial process," the Legislature enacted the anti-SLAPP statute.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 324.)  The statute authorizes a special motion to strike a cause of action arising from the defendant's exercise of his or her constitutional right of petition or free speech, unless the plaintiff establishes a probability of prevailing on the claim.  (Code Civ. Proc., § 425.16, subd. (b).)

Trial courts evaluate anti-SLAPP motions using a two-step process. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712.)  First, the moving-party defendant must establish that the challenged claim arises from activity protected by the anti-SLAPP statute.  (*Ibid.*)  Protected activity is "any act" by a defendant made "in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  (Code Civ. Proc., § 425.16, subd. (b)(1).)  The Legislature has declared that the statute is to be "construed broadly" "to encourage continued participation in matters of public significance" and to avoid chilling such participation "through abuse of the judicial process."  (*Id.*, subd. (a); see *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808.)

If the defendant shows that a challenged cause of action arises out of protected activity, the plaintiff then has the burden to demonstrate a probability of prevailing on the claim.  (*Jarrow Formulas, Inc. v. LaMarche*

10

(2003) 31 Cal.4th 728, 733.) To satisfy this burden, the plaintiff must "demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396.)

We review a trial court's grant of an anti-SLAPP motion de novo. (*Flatley v. Mauro, supra,* 39 Cal.4th at p. 325; *Ben-Shahar v. Pickart* (2014) 231 Cal.App.4th 1043, 1050.)

## I. *First Prong: Protected Activity*

Plaintiffs allege five causes of action, all of which arise out of the statements Kabateck made in the Fox 11 news report and Hutchinson made during the CBS radio program. Under the first prong of the anti-SLAPP analysis, the attorney defendants must show that these activities are protected under the anti-SLAPP statute. Protected activity includes "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e)(4).) Plaintiffs do not dispute that the attorney defendants were acting in furtherance of their right of free speech when they made the challenged statements. They argue, however, that the statements were not made "in connection with a public issue or an issue of public interest."[7] (*Ibid.*) We disagree.

The anti-SLAPP statute does not define the phrases "public interest" or "public issue." The terms are, as one court stated, "inherently amorphous

---

[7] Drobot contends that the attorney defendants' statements do not constitute protected activity as defined in Code of Civil Procedure section 425.16, subdivision (e)(2). This definition encompasses statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." Because we conclude that the challenged statements constitute protected activity under the catch-all definition under subdivision (e)(4), we do not address or decide whether they are also included within the subdivision (e)(2) definition.

11

and thus do not lend themselves to a precise, all-encompassing definition." (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 371.)  Another court has stated, somewhat tautologically, that " 'an issue of public interest' . . . is *any issue in which the public is interested.*"  (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042; see also *Seelig v. Infinity Broadcasting Corp.*, *supra*, 97 Cal.App.4th at p. 808 [public interest should be construed broadly to encourage "vigorous public debate related to issues of public interest"].)  Nevertheless, "judges and attorneys will, or should, know a public concern when they see it."  (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 117.)

Some courts have attempted more helpful statements.  In *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, the First District surveyed numerous cases and, after concluding that none defined "the precise boundaries of a public issue," categorized the cases where a public issue existed as being concerned with either:  (1) "a person or entity in the public eye"; (2) "conduct that could directly affect a large number of people beyond the direct participants"; or (3) "a topic of widespread, public interest."  (*Id.* at p. 924; see also *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [public interest includes "private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity"].)

In *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, the Third District, after declaring it "doubtful [that] an all-encompassing definition could be provided," identified the following "guiding principles . . . derived from decisional authorities":  (1) " 'public interest' does not equate with mere curiosity"; (2) "a matter of public interest should be something of concern to a substantial number of people," not merely "a matter of concern to the speaker and a relatively small, specific audience"; (3) "there should be some degree of closeness between the challenged statements and the asserted public interest"; (4)  "the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy' "; and (5) " 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' "

Informed by these efforts, we turn to the attorney defendants' conduct in this case. Kabateck's statements during the Fox 11 news report raise issues concerning: (1) the installation of alleged counterfeit hardware in Cavalieri's spine; (2) a "conspir[acy]" among plaintiffs and physicians to install "counterfeit hardware" in, perhaps, "many thousands and thousands of people," and to fabricate the costs of the hardware in order to defraud insurance companies; (3) a physician referral kickback scheme involving prostitutes and "lavish trips on private jets"; and (4) the relationship between these schemes and legislation "authored or championed by Senator Calderon and Michael Drobot."

Other than the first issue, which would appear to concern only Cavalieri and those responsible for installing alleged counterfeit medical hardware in her spine, the statements raise matters of public interest. First, because the alleged counterfeit hardware may have been installed in "many thousands" of Californians, there is a substantial number of people who may have been directly affected by the alleged counterfeit hardware. (See *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 481-483 [an allegedly defamatory Internet posting to a church community of 550 to 1,000 members was "large enough to qualify as a 'community' for purposes of [Code of Civil Procedure] section 425.16"].)

Second, members of the public, as consumers of medical services, have an interest in being informed of issues concerning particular doctors and healthcare facilities. (See *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344 (*Carver*) [allegedly defamatory statements about physician involved a matter of public concern because they "served as a warning against" the physician's method of self-promotion]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164-165 [news reports about the physician defendant's issuance of prescriptions for controlled substances concerned a matter of public interest].) If Drobot and facilities with which he is affiliated are or have been engaged in wrongful conduct towards patients, the public has an interest in being informed about such conduct. (Cf. *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898-900 [defamatory statements about an insurance broker were a matter of public concern because the defendant's warning not

13

to use the broker was "ostensibly provided to aid consumers choosing among brokers"].)

Third, the assertions of a widespread illegal physician kickback scheme raise issues concerning the integrity of the health care system, which is a matter of widespread public concern. (See *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 524 [publication raising concerns about the financial survival of four hospitals involved a matter of widespread public interest].) If there were, as Kabateck claimed, "large amounts of kickbacks," the scheme likely involved numerous doctors. Indeed, Drobot's plea agreement states that the scheme involves "dozens of doctors" and others. The public has an interest in learning about the nature and breadth of the alleged scheme, and the identity of those involved. Indeed, the statements would likely raise concerns in anyone whose physician has referred or may refer him or her to another physician.

Fourth, the attorney defendants' statements link the alleged counterfeit medical hardware conspiracy, Drobot's referral kickback scheme, and the bribery of a state legislator. As Kabateck explained, the legislation that Senator Calderon authored or championed "was the mechanism by which [Drobot and the other conspirators] were able to perpetuate the fraud." Bribery of a senator and its connection with health care legislation is undeniably a matter of public concern.

For all these reasons, we conclude that the attorney defendants' statements involved issues of public interest for purposes of the anti-SLAPP statute. Because each of the challenged causes of action is based on these statements, the attorney defendants have satisfied the first prong of the anti-SLAPP analysis as to each claim.

## II.    *Second Prong: Probability Of Success*

Under the second prong of the anti-SLAPP analysis, plaintiffs have the burden of establishing a probability of prevailing on their claims. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 733; Code Civ. Proc., § 425.16, subd. (b)(1).) A "probability" in this context does not mean more probable than not—"[o]nly a cause of action that lacks 'even minimal merit' constitutes a SLAPP." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699-700, quoting *Navellier v. Sletten* (2002) 29 Cal.4th

14

82, 89.)  A plaintiff fails to establish such minimal merit when the cause of action arises from the publication of statements that are privileged as a matter of law.  (See, e.g., *J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 98, 101 (*J-M Manufacturing*); *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926-927; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 783-785; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1065 [because the defendant's allegedly wrongful conduct was privileged, "there was no reasonable probability" that the plaintiff could prevail].)

The attorney defendants assert that their statements in the Fox 11 news report and the CBS radio program are covered by the fair report privilege codified in Civil Code section 47, subdivision (d).[8]  We agree.

The fair report privilege "confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof."  (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 240.)  When it applies, the reported statements are "absolutely privileged regardless of the defendants' motive for reporting" them.  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 278; *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 974 (*McClatchy*).)  Courts have construed the privilege broadly, "mindful of the Legislature's intent . . . 'to preserve the scarce resources of California's courts [and] to avoid using the courts for satellite litigation.' " (*J-M Manufacturing*, *supra*, 247 Cal.App.4th at p. 101.)

"In general, whether a privileged occasion exists within the meaning of Civil Code section 47, subdivision (d), is for the court to decide; whether the report of the official proceedings itself is 'fair and true,' provided reasonable minds could disagree as to the effect of the communication on the average reader or listener, is a question of fact for the jury."  (*J-M Manufacturing*,

---

[8]  Civil Code section 47, subdivision (d)(1) defines a "privileged publication or broadcast" to include one made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued."

15

*supra*, 247 Cal.App.4th at p. 98.) When, however, "there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the report," the question is one of law. (*McClatchy*, *supra*, 189 Cal.App.3d at p. 976; accord *J-M Manufacturing*, *supra*, 247 Cal.App.4th at p. 99.)

Although the fair report privilege is typically invoked by news media defendants, it also protects those who communicate information *to the media*. (*J-M Manufacturing*, *supra*, 247 Cal.App.4th at p. 105; Civ. Code, § 47, subd. (d).) Indeed, the Legislature's explicit purpose for enacting a 1996 amendment to section 47, subdivision (d), was to protect such intermediaries. That amendment expanded the privilege to include fair and true "communication[s] to," as well as fair and true "report[s] in," public journals concerning judicial, legislative, or other public proceedings. (*J-M Manufacturing*, *supra*, 247 Cal.App.4th at pp. 97-98, italics added.) This amendment was enacted to abrogate the holding in *Shahvar v. Superior Court* (1994) 25 Cal.App.4th 653, that an attorney's transmittal of a copy of a pleading to a newspaper was not protected by the fair report privilege. (Stats. 1996, ch. 1055, § 1, pp. 6641-6642; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1144, fn. 3.) The additional language thus "create[d] the bridge" between the litigation privilege (which covered statements made in judicial proceedings) and the fair report privilege (which covered media reports of judicial proceedings) "to protect a third party who communicates this already privilege[d] material to the press." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1540 (1995-1996 Reg. Sess.) as amended June 26, 1996, p. 5; see *J-M Manufacturing*, *supra*, at p. 98.)

Here, the parties do not dispute that the Fox 11 television news show and CBS radio program are "public journals," within the meaning of this statute. (See *Green v. Cortez* (1984) 151 Cal.App.3d 1068, 1073 [television broadcast company and newspapers were "no doubt 'public journals' within the meaning of the statute"].) Nor is there any question that Kabateck's and Hutchinson's statements were "communicat[ed] to" such entities.

The privilege applies to fair and true reports "of anything said in the course" of a "judicial . . . proceeding." (Civ. Code, § 47, subd. (d)(1).) California courts have construed the phrase, "judicial proceeding," broadly to

16

include the filing of a complaint. (*Kurata v. Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224, 227 (*Kurata*); *Abraham v. Lancaster Community Hospital* (1990) 217 Cal.App.3d 796, 823; see *Handelsman v. San Francisco Chronicle* (1970) 11 C.A.3d 381, 385-386 (*Handelsman*) [privilege applied to article about complaint filed "several days earlier"]; see also *Microsoft Corp. v. Yokohama Telecom Corp.* (C.D.Cal. 1998) 993 F.Supp. 782, 784 (*Microsoft*) [press release about allegations in complaint was privileged as a fair report on the judicial proceeding].) Thus, fair and true communications to the news media about allegations in a complaint are covered by the privilege. (See generally, 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 586, pp. 863-864.)

Plaintiffs contend that reports based upon the mere filing of a complaint are not privileged, and that the privilege does not apply until there has been some "judicial action" in the underlying case. They rely on *Burrill v. Nair* (2013) 217 Cal.App.4th 357, disapproved on another point in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 & fn. 11. In *Burrill*, the plaintiff, Dr. Burrill, was a psychologist who had been appointed by a court to act as a counselor in a contentious custody dispute between the defendant, Nair, and Nair's former wife. Nair filed criminal complaints with two police departments and the Federal Bureau of Investigation (FBI), alleging that Dr. Burrill committed numerous wrongful acts and crimes, including fraud, perjury, extortion, racketeering, obstructing justice, and accepting bribes from Nair's former wife. (*Burrill, supra*, 217 Cal.App.4th at p. 375.) On the same day, Nair appeared on a radio news program and accused Dr. Burrill of committing perjury, extortion, and practicing psychology and prescribing medication without a license. (*Id.* at pp. 375-376.) Dr. Burrill sued Nair for defamation, and Nair moved to strike the complaint as a SLAPP. (*Id.* at p. 376.)

The Third District Court of Appeal rejected Nair's reliance on the fair report privilege, stating that "Nair's radio interview was not a report of 'a verified charge or complaint made by any person to a public official, *upon which complaint a warrant has been issued.*' (Civ.Code, § 47, subd. (d), italics added.)" (*Burrill, supra*, 217 Cal.App.4th at p. 396.) Moreover, the court stated that it had found no authority that the "privilege applies to a

17

report of the charges made in a citizen's criminal complaint, made by the citizen who filed that complaint, when there is no evidence any official action has been taken with respect to the complaint." (*Id.* at p. 398.)

The court also quoted the following comment to the Restatement Second of Torts, section 611: "'A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the [fair report privilege]. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action.'" (*Burrill*, *supra*, 217 Cal.App.4th at p. 397, quoting Rest.2d Torts, § 611, com. e, p. 300.)[9]

Here, plaintiffs rely on this quote in *Burrill* to support their argument that there must be some judicial action on a complaint before a report about the complaint is privileged. There are two problems with this reliance. First, the criminal complaints Nair filed with police departments and the FBI were, at most, possible precursors to a judicial proceeding; they were not filed in any court and were not part of any judicial proceeding. The Restatement comment was therefore inapt and the *Burrill* court's quotation of it was unnecessary to its decision. More importantly, the principle expressed in the Restatement comment is not the rule in California. Although there is, as commentators have noted, disagreement on this point among jurisdictions,[10]

_____

[9] The *Burrill* court rejected Nair's argument for the further reason that "[e]ven if the mere filing of a citizen's complaint amounted to an official proceeding within the meaning of the fair reporting privilege, we cannot conclude as a matter of law the statements made in Nair's radio interview are a "'fair and true report'" of the charges made in that complaint." (*Burrill*, *supra*, 217 Cal.App.4th at p. 398.)

[10] The disparate judicial views on this point are collected and discussed in: 50 American Jurisprudence Second (2016 update) Libel and Slander, section 302 ["There is some disagreement . . . as to whether the fair-report privilege applies to reports stating the contents of pleadings in advance of any judicial action on the case"], and 2 Smolla, Law of Defamation

as Witkin states, California courts follow the "view that a complaint or other pleading is part of a 'judicial proceeding,' " and notes that the Restatement comment cited by *Burrill* is "contra." (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 586, p. 864, citing *Mortensen v. Los Angeles Examiner* (1931) 112 Cal.App. 194, 201; *Handelsman*, *supra*, 11 Cal.App.3d at p. 386; *Kurata*, *supra*, 4 Cal.App.2d at p. 227.) To the extent that *Burrill* suggests otherwise, we decline to follow it.

We must still determine whether, as a matter of law, Kabateck's and Hutchinson's statements in the challenged news reports were "fair and true" communications for purposes of the privilege. "Fair and true" in this context does not refer to the truth or accuracy of the matters asserted in the judicial proceedings, but rather to the accuracy of the challenged statements with respect to what occurred in the judicial proceedings. (*McClatchy*, *supra*, 189 Cal.App.3d at p. 975; *Rollenhagen v. City of Orange* (1981) 116 Cal.App.3d 414, 427, disapproved on another point in *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 738.) Thus, we are not concerned with either the merits of Cavalieri's allegations or the truth of Kabateck's and Hutchinson's statements to the media about the plaintiffs, but rather the extent to which the attorneys' statements accurately conveyed the substance of the allegations made in the Cavalieri complaint. (See *Kilgore v. Younger* (1982) 30 Cal.3d 770, 795; *McClatchy*, *supra*, 189 Cal.App.3d at p. 975.) Such accuracy is measured by the natural and probable effect the statements

---

(2d ed. 2016 update) § 8:70 (contrasting the "older view" that "the fair report privilege for judicial proceedings in not 'activated' until some official action in the litigation has transpired," with the "modern view" that "the fair report privilege . . . extends to a summary of the accusations in a complaint, though no official action has taken place").

In 2010, the New Jersey Supreme Court conducted an exhaustive review of the issue and the competing policy concerns, and observed "a clear trend away from recognizing the initial pleadings exception" to the privilege. (*Salzano v. N.J. Media Group Inc.* (2010) 201 N.J. 500, 517 [993 A.2d 778, 789].) The court concluded: "We now align ourselves with the weight of modern authority and hold that the fair-report privilege extends to defamatory statements contained in filed pleadings that have not yet come before a judicial officer." (*Id.* at p. 790.)

would have on the average person reading, viewing, or listening to the report. (*Kilgore v. Younger*, *supra*, at p. 797; *Carver*, *supra*, 135 Cal.App.4th at p. 352; *Handelsman*, *supra*, 11 Cal.App.3d at p. 387.)

Plaintiffs address this issue by comparing what the attorneys said in the television and radio reports with what Drobot admitted in his federal plea bargain. They argue, for example, that Drobot "admitted only to participating in a scheme to inflate the cost of medical hardware used in spinal surgeries at [Pacific Hospital] that was charged to insurance companies," not to "using counterfeit, unclean, unsafe, or non-FDA-approved hardware in spinal surgeries." Plaintiffs also compare Drobot's admission that he bribed Senator Calderon in various ways that did not involve prostitutes, with Kabateck's statement that Drobot was involved in supplying prostitutes as bribes or kickbacks. These are the wrong comparisons. The issue is not whether Kabateck's and Hutchinson's statements were fair and true communications about Drobot's federal plea agreement, but whether they were fair and true communications about the allegations in the Cavalieri complaint.

There is no dispute that the statements Kabateck and Hutchinson made in their television and radio appearances were substantially similar to the allegedly defamatory statements made in the Cavalieri complaint. Specifically, the Cavalieri complaint includes allegations that Drobot and Pacific Hospital used "counterfeit, non-FDA approved, 'knock-off' " medical hardware, which they "implanted into thousands of patients, including [Cavalieri]." The complaint further alleged that Drobot's kickbacks included cash, air travel, "and prostitutes or other 'adult entertainers' "as part of a "conspiracy to defraud insurance carriers." The statements Kabateck and Hutchinson made in their media appearances that gave rise to the plaintiffs' claims reflect the gist or sting of these allegations. (See *Carver*, *supra*, 135 Cal.App.4th at p. 351; *Jennings v. Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119, 127 (*Jennings*).)

An attorney may not, however, make defamatory allegations in a complaint and then report the same alleged facts, *as facts*, to the media with impunity. This is because the fair report privilege protects reports and communications "*of* . . . a judicial . . . proceeding, or . . . *of* anything said

20

in the course thereof." (Civ. Code, § 47, subd. (d)(1), italics added.) That is, the statements are privileged if they are fair and true reports *about the proceedings* or of what was *said in the proceedings*. (See *Hawran v. Hixson, supra*, 209 Cal.App.4th at p. 280; *Microsoft, supra*, 993 F.Supp. at p. 784.) There is thus a critical difference between communicating to the media what is alleged in a complaint and communicating the alleged facts without reference to the complaint. More particularly, the attorney defendants in this case are protected from liability under the fair report privilege in informing the news media that they have alleged that plaintiffs used counterfeit screws in spinal surgeries and supplied prostitutes to Senator Calderon, but they are not protected if they informed the media that such facts were true. The issue is whether the average viewer or listener of the media reports would understand the attorneys' statements as communications about the Cavalieri complaint (which would be privileged) or as facts (which would not). (See *Kilgore, supra*, 30 Cal.3d at p. 777; *Jennings, supra*, 164 Cal.App.3d at p. 127.)

We have examined the video of the television news report involving Kabateck and listened to Hutchinson's statements on the CBS radio report. Kabateck's initial statement in the television report refers to a conspiracy among the hospitals and doctors that "we allege in the complaint." Although his subsequent statements do not mention the complaint or allegations, Kabateck is identified by the reporter near the outset of the news report as Cavalieri's attorney, and his statements are interspersed among the reporter's frequent references to the Cavalieri lawsuit and images of the complaint shown in the background. The average person watching the report in its entirety would reasonably understand that Kabateck was referring to the allegations in the lawsuit he filed on Cavalieri's behalf. Although some statements, when viewed in isolation, could be understood to communicate the allegedly defamatory matter as facts, not mere allegations of facts, when the media reports are viewed in their entirety and in the context in which they were made, the only reasonable conclusion is that the statements refer to the allegations made in the Cavalieri complaint.

The CBS radio report involving Hutchinson begins with the announcement that a "massive medical fraud lawsuit has been filed against

21

several Southern California hospitals and doctors," and Hutchinson is introduced as an attorney who was "alleging that insurance companies were defrauding . . . when these phony medical devices were billed at outrageously high prices." The reporter precedes Hutchinson's edited comments by informing the listener that the "lawsuit alleges," what "[a]ttorney Robert Hutchinson alleges," what "[t]hey alleged," and by referring to "this [S]outhern California case." Near the end of the interview, Hutchinson states, "*we alleged* that doctors actually knew that they were using counterfeit screws and agreed to do it and they were getting kickbacks from the hospitals and some of the marketers to bring their patients to the hospitals involved and use the counterfeit screws and that's what provided the cash flow which in turn was—*we alleged* delivered that many of these doctors in the form of kickbacks.'" (Italics added.) Viewed in their context, the only reasonable conclusion that listeners could draw from the radio program is that Hutchinson is an attorney *alleging* the matters described in the program.

For the foregoing reasons, Kabateck's and Hutchinson's statements constituted fair and true communications to the news media about a judicial proceeding—i.e., the allegations in the Cavalieri complaint—and are therefore protected by the fair report privilege.

When, as here, the fair report privilege applies, it is absolute, and we have no occasion to consider the attorney defendants' motives or whether the statements were uttered with malice. (*J-M Manufacturing*, *supra*, 247 Cal.App.4th at p. 98 & fn. 4; *Jennings*, *supra*, 164 Cal.App.3d at p. 128.) We do not, therefore, address the parties' arguments concerning these issues or have reason to consider whether Drobot is a public figure or limited purpose public figure.

Plaintiffs contend that this result would allow an attorney who has filed a complaint in court to repeat false and defamatory allegations from the complaint to the media and thereby "effectively immunize the sort of litigation through the press that cases applying the litigation privilege have condemned." This concern, while valid, is offset by the policy reasons for the privilege. Although the privilege "may result in persons suffering injury to their reputations without recourse, the rule is considered essential to allow

22

the public to keep informed as to what is occurring in its judicial system."
(Annot., Libel and Slander:  Reports of Pleadings as Within Privilege
for Reports of Judicial Proceedings (1983) 20 A.L.R.4th 576, 579, § 2.)
Moreover, the Legislature has limited the fair report privilege to address
the concern that attorneys will litigate in the press by precluding its
application to any communication that violates rule 5-120(A) of the California
State Bar Rules of Professional Conduct.  (Civ. Code, § 47, subd. (d)(2)(A).)
That rule provides:  "A member [of the State Bar] who is participating or
has participated in the investigation or litigation of a matter shall not
make an extrajudicial statement that a reasonable person would expect to
be disseminated by means of public communication if the member knows
or reasonably should know that it will have a substantial likelihood of
materially prejudicing an adjudicative proceeding in the matter."  (Cal. Rules
of Professional Conduct, rule 5-120(A).)  Further limitations on the fair report
privilege should be left to the Legislature.

The risk that attorneys will abuse the fair report privilege is further
reduced by the possibility that the privilege, while "absolute," would not
immunize the attorneys from malicious prosecution liability for prosecuting
the underlying lawsuit.  (Cf. *Albertson v. Raboff* (1956) 46 Cal.2d 375, 382
[communication absolutely privileged for purposes of defamation does not
prevent malicious prosecution action based on the communication]; see also
*Salzano*, *supra*, 993 A.2d at p. 790 [availability of malicious prosecution
cause of action supports application of fair report privilege to initial
pleading].)[11]

---

[11] The plaintiffs argue that we should reverse the order awarding the
attorney defendants' their attorney fees "[i]f this court reverses the trial
court's order granting" the anti-SLAPP motion.  They do not otherwise
challenge the attorney fee award.  Because we affirm the order granting the
anti-SLAPP motion, we also affirm the award of attorney fees. (See *Carver*,
*supra*, 135 Cal.App.4th at p. 360.)

## DISPOSITION

The order granting the attorney defendants' special motion to strike and awarding the attorney defendants their attorney fees is affirmed.

Respondents are awarded their costs on appeal.

                                        ROTHSCHILD, P. J.

We concur:


        JOHNSON, J.



        LUI, J.

24

Filed 1/10/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HEALTHSMART PACIFIC, INC. et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> BRIAN S. KABATECK et al., <br><br>     Defendants and Respondents. | B264300 <br><br> (Los Angeles County <br> Super. Ct. No. BC566549) <br><br> ORDER CERTIFYING THE OPINION FOR PUBLICATION |

The opinion in the above-entitled matter filed December 19, 2016, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

ROTHSCHILD, P. J.            JOHNSON, J.            LUI, J.