Filed 10/1/21  Dababneh v. Lopez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MATTHEW DABABNEH, | C088848 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2018-00238699-CU-DF-GDS) |
| v. | |
| PAMELA LOPEZ, | |
| Defendant and Appellant. | |

In a letter complaint to the chair of the California Assembly Rules Committee, Pamela Lopez reported that Assembly member Matthew Dababneh pushed her into a bathroom at a 2016 party in Las Vegas, blocked the door, and masturbated while urging her to touch him.  On the same day she mailed the letter, Lopez called a press conference to announce that she had submitted the complaint to the Assembly, described the incident and stated that she had spoken to friends privately about it at the time.  Also on the same day, the Los Angeles Times published an article entitled "California assemblyman accused of forcing lobbyist into bathroom and masturbating."  In the article, Lopez

1

provided more detail about the incident, including that Dababneh said he could not believe what he had just done. Dababneh resigned from the Legislature at the beginning of January 2018.

Dababneh sued Lopez for defamation and intentional infliction of emotional distress, alleging that she made knowingly false public statements. Lopez brought a special motion to strike Dababneh's complaint under Code of Civil Procedure section 425.16, California's anti-SLAPP law.[1] The trial judge denied the motion, ruling that Lopez's statements to the press were not privileged.

We conclude that Lopez's statements to the press regarding her report to the Legislature come within the privilege set forth in Civil Code section 47, subdivision (d), for a "fair and true report" of a "legislative" proceeding, and accordingly cannot provide a basis for an action for defamation or intentional infliction of emotional distress.[2] The trial court's order is reversed with directions to grant the special motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

In a letter dated December 4, 2017, to Ken Cooley, the chair of the Assembly Rules Committee, Lopez stated: "I am writing to report that I was sexually assaulted by Assembly Member Dababneh."

Lopez continued: "It is not my intention to report every detail of what happened in this letter, but here is a brief description. [¶] On January 16, 2016, Mr. Dababneh and I were two of the many invited guests at a party to celebrate two mutual friends who were planning to get married. Most of the guests in attendance were political professionals,

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2] Undesignated statutory references are to the Civil Code.

including many colleagues and associates I have known for years. I should have had no reason to fear for my safety. When I went to the bathroom after being at the party for a few hours, I felt the weight of a body push me into the restroom. I heard the door slam behind us. When I turned around, I saw that it was Matt Dababneh. He stood blocking the door and began to masturbate and move toward me, urging me to touch him. It was a terrifying experience. During the time he blocked me in that room, my instincts were focused on escaping without any physical contact and in a way that would not cause a scene. Before the ordeal ended, he told me not to tell anyone."

"Although a number of press reports have placed this event in Sacramento, it actually occurred at a private venue inside a Las Vegas Hotel. I went along with the assumption that it happened in Sacramento because I realized that correcting this assumption would likely have led to the identification of Mr. Dababneh and I was not ready to take this step."

Lopez stated that she decided to name Dababneh after members of an Assembly subcommittee, including Cooley, encouraged women to come forward.

A week earlier, on November 27, 2017, Cooley spoke at a hearing of the Assembly Subcommittee on Harassment, Discrimination, and Retaliation Prevention and Response. Cooley stated that "[t]he Assembly strongly encourages all individuals to report any incidents of harassment, discrimination, or retaliation. I hear--I understand that people are afraid to report, but this is the area where we need to go where it can be brought forward. Ultimately, this institution needs to set a tone that this is just--it is unacceptable--and that if people see it or encounter it, they need to say something."

At the hearing, Cooley described the process under the Assembly sexual harassment policy wherein a complaint, verbal or in writing, could be submitted to various government officials, including any member of the Rules Committee. When a complaint is received, the matter is assessed. The Assembly provides all parties due process and aims to reach reasonable conclusions based on the evidence collected. The

3

Assembly has a duty to investigate and take corrective action. When a policy violation is alleged, the chief administrative officer of the Assembly and the human resources director will review the facts to determine next steps. This can include investigation by an independent attorney or by the human resources staff. The investigator interviews witnesses and gathers facts to determine if the allegation is substantiated. If the allegation is substantiated, corrective measures are taken depending on the seriousness of the violation from verbal counseling to suspension without pay, demotion, or additional training. The final step is to inform the complainant of the outcome of the investigation, but not provide specific information on the corrective measures.

The same day that Lopez submitted the letter to the Assembly, she gave a press conference. Lopez stated at the outset: "I'm here to announce that this morning I submitted a report to the Assembly Rules Committee identifying that I was sexually assaulted in January of 2016 by Assembly Member Matt Dababneh."

At the press conference, Lopez further described the circumstances that she said made her come forward, including that Cooley "urged women who have been sexually harassed within the California political community to step forward and speak to the legislature and seek redress through their processes" and "[t]his is a moment of collective action. Many women have stepped forward and said, 'Me too. I've been sexually harassed,' or, 'I've been sexually assaulted in my workplace.' And it's taken courage for them to do that."

At the press conference Lopez was asked, "Could you just confirm where the incident happened? I believe in the letter to Ken Cooley it was in Las Vegas. Can you tell us after that happened, did you speak to anyone around you -- to anyone around you about it after that?"

Lopez answered: "Yes. The event occurred at a celebration, a friend's celebration of a wedding in Las Vegas. And I did speak to friends privately after that. I was hurt and scared, and so I reached out to the people who love me, some of my closest friends and

4

family members, and talked about my experience with them.  [¶]  I was also terrified of being shunned or retaliated against if the Capitol community knew what happened to me.  So I -- I made my closest friends and loved ones swear -- swear to secrecy.”

Lopez was asked, “And I know you’ve been through this, but if you can just kind of recap what happened that day.”  Lopez responded:  “Yes.  I was celebrating a wedding with friends.  I had no reason to think that I was unsafe.  It was a wonderful, festive event.  And I went to the restroom and I felt a body, a large body, rush up behind me, use the weight of their body to push me into the restroom, and I heard the door slam behind us.  [¶]  I spun around and realized that I was face to face with Matt Dababneh, and that he had very quickly exposed himself and begun masturbating.  I started backing up, and he moved toward me while he was masturbating, and in explicit terms told me to touch his genitals while he was masturbating.  [¶]  And I remember thinking, Oh, my God.  What do I do?  What do I do?  I thought:  Make it very clear that I do not want to be here, and that there is no misunderstanding.  And so I said several times ‘No, I will not touch you.  No, I will not touch you.’ ”

On the same day as the press conference, the Los Angeles Times published an article titled “California assemblyman accused of forcing lobbyist into bathroom and masturbating.”  (<https://www.latimes.com/politics/la-pol-ca-matt-dababneh-harassment-20171204-story.html> [as of Sept. 30, 2021].)  The article began:  “Sacramento lobbyist Pamela Lopez has claimed that, in 2016, Democratic Assemblyman Matt Dababneh followed her into a bathroom, masturbated in front of her and urged her to touch him.  Dababneh has strongly denied the allegation.  [¶]  ‘It was Matt Dababneh,’ Lopez told the Times in a November interview.  [¶]  Lopez jolted the California political world seven weeks ago when she first shared her account of an encounter in Las Vegas, joining more than 140 women as they denounced in an open letter a ‘pervasive’ culture of sexual harassment and misconduct in the state Capitol.  [¶]  Lopez had not publicly accused

5

Dababneh until Monday, when she formally filed a complaint with the Assembly and named him at a news conference."

The article reported that Lopez described the encounter with Dababneh as follows: "Lopez said she felt a large body following her into a single-use bathroom. She said it was Dababneh, who is more than 6 feet tall and sturdily built. [¶] 'The weight of that body was pushing me into the restroom. I heard the door slam behind me,' Lopez said. 'I spun around and by the time I had gotten myself spun around, I saw that I was facing Matt Dababneh and he had unzipped his pants and exposed himself and had begun to masturbate.' [¶] Lopez said she backed away from him, her mind racing with the realization of what was happening. 'The panic was just immense,' she said. [¶] Lopez said Dababneh demanded that she touch his genitals.

" 'I remember thinking, at the very least, make it very clear you don't want to be here,' she said. 'Don't say anything to allow him to misinterpret your refusal as you being shy or coquettish.' [¶] She said she stated firmly she would not touch him, and repeated it multiple times. She said he then asked her to touch him elsewhere, even just rest her arm on him. Lopez said she interpreted the request as a type of attempted negotiation. Again, she refused. She said that Dababneh then ejaculated into the toilet. The whole encounter lasted less than five minutes, Lopez said.

"Lopez said that Dababneh immediately expressed regret and disbelief. She said he told her, 'I can't believe I just did that.' [¶] Lopez said she pointed him toward the door. She said that, as he exited, Dababneh told her not to say anything. She said she turned the request back on him, raising her voice: 'Don't *you* tell anyone this happened.' "

On June 25, 2018, the chief administrative officer informed Lopez by letter that an independent attorney had investigated her allegations, interviewing 52 witnesses and Lopez, and made factual findings in a confidential report substantiating that it was more likely than not the facts Lopez alleged did occur. This conduct was found to violate the

6

Assembly policy against sexual harassment. Dababneh appealed and, on August 24, 2018, Cooley informed Lopez that, after a thorough review and evaluation, the appeal was denied.**3**

On August 14, 2018, Dababneh filed a complaint for defamation and intentional infliction of emotional distress arising out of Lopez's accusation of sexual assault. Dababneh alleged that "on or about December 4, 2017, Lopez filed a false complaint with the California State Assembly, in which she alleged that, on the evening of January 16, 2016, while at the friends' party, Dababneh pushed Lopez into a bathroom and masturbated in front of her while urging her to touch him." Dababneh further alleged that, "on the same day, December 4, 2017, Lopez conducted a news conference in Sacramento, at which she made the same false allegations against Dababneh. In the news conference, Lopez again fabricated that Dababneh followed her into a restroom, exposed himself, masturbated, and asked her to touch him."

In Dababneh's cause of action for defamation, he alleged that Lopez "made false and defamatory statements about Plaintiff including that Plaintiff pushed her into a bathroom, masturbated in front of her and urged her to touch him. [¶] . . . Those statements were false and known to Lopez to be false when made. The statements were made publicly and in a variety of ways, including to various news media and in a press conference on December 4, 2017 held at K Street Consulting in Sacramento. These false statements were published and re-published to the general public." Dababneh alleged

---

**3** We deferred ruling on Dababneh's request for judicial notice of documents from a writ proceeding he instituted to require the Assembly to set aside its decision. We now deny the request. These documents were not presented to the trial court and are irrelevant to the issues on appeal. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; *Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 625-626.)

that Lopez "acted maliciously, with knowledge that the statements in the press conference and complaint filed with the California State Assembly were false." Dababneh's cause of action for intentional infliction of emotional distress incorporated the facts alleged in his defamation claim and did not allege additional facts giving rise to his claim of emotional distress.

On October 25, 2018, Lopez filed an anti-SLAPP motion under section 425.16 of the Code of Civil Procedure. Lopez argued that the "two instances of speech" alleged in Dababneh's complaint—Lopez's written complaint to the Assembly and the press conference—were absolutely protected under subdivision (e)(1) and (2) of Code of Civil Procedure section 425.16. Lopez further argued that her speech was related to an issue of public concern, i.e., exposure and eradication of sexual misconduct, within the meaning of subdivision (e)(3) of Code of Civil Procedure section 425.16. Lopez also contended that Dababneh could not establish a probability of prevailing on his claim that Lopez's statements were false and unprivileged under Civil Code section 47, subdivisions (b), (c) and (d).

In opposition, Dababneh submitted a declaration stating that none of the conduct Lopez described occurred and the claims she made, including in statements to the press, were categorically false. Dababneh argued that Lopez's statements at the press conference and in the Los Angeles Times article were not privileged under any subdivision of section 47. Dababneh further contended that Lopez's anti-SLAPP motion should be denied because he could demonstrate a likelihood that he could prevail on his defamation claim because Lopez knowingly made false statements that he sexually assaulted her.

On December 6, 2018, the trial court conducted a hearing on Lopez's anti-SLAPP motion and took the matter under submission. On January 16, 2019, the court issued a ruling. The court noted that Dababneh appeared to concede that Lopez's statements to the Assembly and the press alleged in his complaint arose from activity protected by the

8

anti-SLAPP statute. The court observed that Lopez's statements to the press were "at the very least" on a matter of particular public interest—sexual harassment in the workplace—and concerned a public figure. The court also noted that Lopez's letter to the Assembly was submitted to a legislative body. The court concluded that "[t]herefore, the primary question presented here is whether Plaintiff has presented evidence sufficient to support a judgment in his favor" on either or both of his claims of defamation and intentional infliction of emotional distress.

The trial court found that Dababneh, as a public figure, was required to prove that a defamatory statement was made with " 'actual malice,' " i.e., that Lopez knew that her statements that Dababneh assaulted her were false or she made them with reckless disregard whether they were true or not. The court concluded that establishing Lopez knew her statements were false "is essentially one and the same" as establishing that they were false. "Thus, in this case, a finding of 'falsity' includes a finding of 'actual malice.' "

The trial court noted that Dababneh submitted a declaration swearing that he never used the restroom and never masturbated in front of Lopez. Reasoning that "the matter comes down to a credibility determination" as to whether Dababneh or Lopez is telling the truth, the court found that Dababneh's declaration, which the court said it must accept as true in ruling on an anti-SLAPP motion, was sufficient evidence alone to support a finding that Dababneh had a probability of establishing that Lopez's statements were false.

The court rejected Lopez's contention that her statements at the press conference fell within the protection of section 47, subdivision (b), for statements made in a legislative proceeding. The court concluded Lopez's complaint letter qualified for this privilege but the press conference did not.

The court also disagreed with Lopez that her statements to the press were privileged under section 47, subdivision (d), as a "fair and true" report in a

communication to a public journal of a legislative proceeding. The court noted that the privilege also applies to accurate descriptions of the allegations in a complaint filed in a civil lawsuit regardless of the truth of the allegations, if it is clear the complaint is being described. The court concluded the privilege did not apply because Lopez's statements to the press did not describe a legislative proceeding, i.e., the Assembly's revision of its sexual harassment policy, but rather her allegations of sexual assault. Further, the trial court reasoned that publication of the contents of preliminary pleadings such as a complaint before any judicial action had been taken were not privileged, in order to discourage a scheme to file a complaint to publicize its contents and then drop the action.

Finally, the trial court found that Lopez's statements did not qualify for the limited common interest privilege "which applies only to communications made without malice," because Dababneh had "presented sufficient evidence to demonstrate a probability of success on his claims, which requires a showing of malice."

Thus, the court granted Lopez's anti-SLAPP motion as to her complaint to the Assembly but denied the motion regarding her statements to the press.

## DISCUSSION

### *Anti-SLAPP Statute*

Code of Civil Procedure section 425.16, subdivision (b)(1), provides that a cause of action arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is subject to a special motion to strike "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Code of Civil Procedure, section 425.16, subdivision (e), defines the phrase " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " to include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or

10

any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Application of the anti-SLAPP statute involves a two-step process: " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 378 (*Burrill*), disapproved on another ground in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, fn. 11.) We review the trial court's ruling denying Lopez's anti-SLAPP motion de novo. (*Burrill, supra*, 217 Cal.App.4th at p. 382.)

Dababneh does not dispute that the statements alleged in his complaint constituted protected activity under Code of Civil Procedure section 425.16. Further, there is no dispute that Lopez's complaint to the Assembly is privileged under Civil Code section 47, subdivision (b).[4] Thus, this appeal concerns only the second prong of the anti-SLAPP analysis and Lopez's statements to the press.

---

[4] (See *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 363-364 (*Hagberg*) ["section 47[, subdivision ](b) privilege applies to complaints to governmental agencies requesting the agency investigate or remedy wrongdoing"]; *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 368 [§ 47, subd. (b), [cl. ](3) applies to employee's sexual harassment complaint to Equal Employment Opportunity Commission].)

11

We first consider whether Lopez's statements to the press and in the article were privileged under section 47, subdivision (b), clause (1), the legislative proceeding privilege, and/or subdivision (d), the fair and true reporting privilege.  On that issue, "[d]efendants bear the burden of proving the privilege's applicability.  [Citation.]" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 278 (*Hawran*); *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 769.)  But Dababneh "retains the burden to show, under the second step of the anti-SLAPP analysis, that he has a probability of prevailing on the merits of the claim."  (*Laker, supra*, 32 Cal.App.5th at p. 769.)  A plaintiff cannot establish a probability of prevailing if a privilege precludes liability on a defamation claim.  (*Ibid*.)  Thus, if a challenged statement is privileged, the trial court should grant the anti-SLAPP motion.  (*Ibid.*; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1065.)

Because there is no factual dispute over the content of the statements Lopez made at the press conference and in the Los Angeles Times article, whether the privilege is applicable is a question of law.  (*Hawran, supra*, 209 Cal.App.4th at pp. 278-279.)

*Legislative Proceeding Privilege*

Section 47, subdivision (b), provides that a "privileged publication" is one made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law . . . ."  Construing section 47, subdivision (b) privilege in the context of a judicial proceeding, the California Supreme Court has held that the privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).)

Lopez acknowledges that "the litigation privilege does not always apply to statements made about litigation to the general public through the press."  Indeed, in *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768 (*Argentieri*), the court held there must

12

be "sufficient nexus between the statement and the litigation. Specifically, the statement must 'achieve the objects of the litigation,' which requires that it 'be connected with, or have some logical relation to the action.' " (*Id.* at p. 785; *Silberg, supra*, 50 Cal.3d at pp. 219-220.) "It therefore must 'function as a *necessary or useful step in the litigation process* and . . . serve its purposes.' [Citation.] 'This is a very different thing from saying that the communication's *content* need only be related in some way to the subject matter of the litigation . . . .' [Citation.]" (*Argentieri, supra*, 8 Cal.App.5th at pp. 785-786.)

In *Argentieri*, Facebook and its founder, Mark Zuckerberg, brought a malicious prosecution action against, among others, Paul Argentieri, an attorney for Paul Ceglia, whose suit contending he had entered into a written contract with Zuckerberg giving Ceglia an 84 percent ownership interest in Facebook was dismissed as a fraud on the court and because Ceglia had spoliated evidence. (*Argentieri, supra*, 8 Cal.App.5th at pp. 772-773.) General counsel for Facebook e-mailed a release to the press stating that attorneys for Ceglia pursued his suit knowing that it was based on forged documents. (*Ibid.*) After the malicious prosecution action was dismissed against Argentieri, he sued claiming he was defamed by the e-mail. (*Id.* at p. 773.) Argentieri's suit was dismissed on an anti-SLAPP motion. (*Ibid.*) The trial court based its decision in part on a determination that the e-mail was covered by the litigation privilege under section 47, subdivision (b). (*Argentieri, supra*, 8 Cal.App.5th at p. 779.)

The appellate court disagreed, finding that the e-mailed press release was not a "useful step" in the malicious prosecution action. (*Argentieri, supra*, 8 Cal.App.5th at p. 786.) The court rejected the defendants' argument that the press release furthered the goal of the lawsuit to "set the public record straight" regarding Ceglia's fraud and to hold his lawyers accountable. (*Ibid.*) The court characterized this argument as "nothing more than saying they wanted the world to know their view of the dispute—which does not further the litigation *itself.*" (*Id.* at pp. 786-787.)

13

We find a parallel with Lopez's press conference to announce her complaint to the Assembly. As described above, Lopez's complaint set in motion a process which led to an investigation by an independent attorney, who interviewed witnesses and submitted a report that Lopez's claims were more likely than not substantiated. Dababneh appealed and the Assembly denied the appeal. Lopez's press conference was not a "useful step" in this process. Rather, the press conference served to let the world know of her complaint to the Assembly naming Dababneh, as well as highlight the significance and circumstances of her decision to speak out as part of the "Me Too" movement, which did not further the Assembly's process of assessing, investigating and reaching a determination on Lopez's sexual harassment complaint.

In *Hawran, supra*, 209 Cal.App.4th 256, the court expressed a similar view regarding a press release a company issued after an internal investigation implicating its chief financial officer in mishandling research and development of a diagnostic test for Down syndrome, which led the Securities and Exchange Commission (SEC) to commence an investigation. (*Id.* at pp. 263-264.) When the chief financial officer sued alleging defamation and other causes of action, the defendants brought an anti-SLAPP motion, arguing in part that the press release was absolutely privileged under section 47, subdivision (b), i.e., statements made in an official proceeding. (*Hawran, supra*, 209 Cal.App.4th at p. 265.)

The *Hawran* court said, "[i]t is questionable whether a press release so widely disseminated to the public at large . . . can meet the requirements of the official proceeding privilege." (*Hawran, supra*, 209 Cal.App.4th at p. 283.) The court cited *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, in which the court declined to apply the litigation privilege in section 47, subdivision (b), to press conferences or press releases, "explaining that the ' "connection or logical relation" which a communication must bear to litigation in order for the privilege to apply, is a *functional* connection,' i.e., the communication must 'function as a necessary or useful step in the litigation process and

14

must serve its purposes' [citation] and 'cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation,' including vindication in the court of public opinion [citation]." (*Hawran, supra*, 209 Cal.App.4th at p. 283.)

Lopez, however, argues that subdivision (b), clause (1) of section 47 regarding statements made in legislative proceedings is broader than the litigation privilege found in section (b), clause (2). Lopez principally relies on *Scott v. McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277 (*Scott*). In *Scott*, the city manager of Santa Monica alleged that the defendants published letters containing defamatory statements about his character and performance at city council proceedings. (*Id.* at pp. 282-284.)

The *Scott* court noted that, under the legislative proceeding privilege codified in section 47, "[a]bsolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not defeat the privilege [citation] when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body." (*Scott, supra*, 37 Cal.App.3d at p. 285.) The court said: "In the instant case, the allegedly defamatory statements have a clear connection with the work of the legislative body (the Santa Monica City Council) in that they relate to the retention of an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council. The reading of the letters at the city council meeting was privileged, as was the distribution of copies of the letters to members of the audience (including the press) attending the council meeting." (*Id.* at pp. 285-286, fn. omitted.)

The court did not apply the legislative proceeding privilege to certain statements made outside the council chambers. Rather, the court found that these particular statements were not libelous, because " 'it is settled law that mere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office.' [Citation.]" (*Scott, supra*, 37 Cal.App.3d at p. 290.)

15

The *Scott* court also addressed the principle that the section 47 privilege applies to statements made to achieve the objective of the relevant proceeding and offered this statement on how the legislative proceedings privilege operates differently. "[W]e recognize that the immunity historically afforded to legislators does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of the legislation. Rather, the rule appears well settled that the general immunity afforded legislators extends to all that is spoken or done in the course of legislative proceedings. [Citation.]" (*Scott, supra*, 37 Cal.App.3d at p. 288.) "The immunity attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body. [Citations.] Since we hold that the statements made and copies of the letters distributed at the city council meeting were privileged, plaintiff's predication of liability upon their utterance and/or distribution *at that* time must fail." (*Ibid.*)

In sum, *Scott* does not address the legislative proceeding privilege outside of the proceedings themselves, including statements made at a press conference, as here, to inform the public of a complaint submitted to the Legislature. Rather, *Scott* stands for the principle that the legislative proceeding privilege is interpreted broadly to statements by legislators and members of the public who wish to address matters before the legislative body. The privilege applies not just to statements directly related to the proceeding but all that is spoken or occurs during the proceeding. (*People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 944 ["Civil Code section 47 subdivision (b)[, clause ](1) declares as absolutely privileged any publication made in any legislative proceeding"]; but see *Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 324 ["What has been said relative to judicial proceedings is applicable with equal force to other official proceedings authorized by law, such as the school board meeting in question. Thus, the determinative issue in this case is not whether the defamation took place on a privileged occasion, but

16

whether the defamatory statement was made to achieve the object of the meeting convened to discuss the school budget"].)

Lopez also cites *Cayley v. Nunn* (1987) 190 Cal.App.3d 300 (*Cayley*), which involved the application of the litigation privilege to a dispute between neighbors about a height variance sought by the Nunns from the city council to add a bedroom over the garage and opposed by the Cayleys because they claimed it would block their view. (*Id.* at p. 302.) The Cayleys sued the Nunns alleging they circulated petitions presented to the city council to evidence neighborhood support for their position and in doing so made slanderous comments to potential signers that the Cayleys had tapped the Nunns' telephone. (*Ibid.*)

The *Cayley* court held that the litigation privilege applies to city council proceedings, citing *Scott*. (*Cayley, supra*, 190 Cal.App.3d at p. 303.) The court continued that "communications made prior to legal action itself are privileged if they have some logical connection to the suit and are made to achieve the objects of the litigation." (*Id.* at pp. 303-304.) The privilege applies outside the courtroom and embraces preliminary conversations that "are in some way related to or connected to the pending or contemplated action." (*Id.* at p. 304.) To accomplish the purpose of the privilege and as an adjunct to the right of access to judicial and quasi-judicial proceedings, private parties and interested persons must be able to confer, marshal evidence and prepare materials for presentation in the proceeding " ' "unchilled by the thought of subsequent judicial action against such participants; *provided always, of course, that such preliminary meetings, conduct and activities are directed toward the achievement of the objects of the litigation or other proceedings. . . .*" ' " (*Ibid.*, italics added.)

The court concluded "it is clear that the alleged slanderous statements were made during preliminary conversations while defendants were marshalling evidence and preparing for their presentation at the city council meeting. Therefore, defendants'

17

statements cannot be considered irrelevant to the proceedings and they were directed toward the achievement of the objects of the proceeding." (*Cayley, supra*, 190 Cal.App.3d at p. 304; see also *Dean v. Friends of Pine Meadow* (2018) 21 Cal.App.5th 91, 107-108 [" ' "The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action" ' "]; *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 586-587 ["the 'litigation privilege' as statutorily applied to legislative proceedings" applied because "the entire thrust of [defendant's] activity was to enable the enactment of legislation, by soliciting other interested parties to pursue it, and assisting them with information and expertise"].)

*Cayley* does not aid Lopez. To the contrary, the case undermines Lopez's position that the legislative proceeding privilege is broader than the litigation privilege. *Cayley* applied the litigation privilege to proceedings before a legislative body (the city council) and adhered to the requirement that a privileged communication must be directed toward the achievement of the object of the litigation or other proceeding. (*Cayley, supra*, 190 Cal.App.3d at p. 304.) Moreover, *Cayley* involved marshaling evidence and preparing for a presentation to the city council, not announcing to the press after the fact that a complaint had been submitted to a legislative body.

Lopez places great emphasis on broad statements in *Cayley* that "[t]o partake in the privilege a publication need not be pertinent, relevant or material in a technical sense to any issue in the proceedings. [Citations.] The privilege is denied to any participant in legal proceedings only when the matter is so palpably irrelevant to the subject matter that no reasonable man can doubt its irrelevancy and impropriety. [Citation.]" (*Cayley, supra*, 190 Cal.App.3d at p. 304.) However, in *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, the court said: "Whatever the pre-*Silberg* merits of these expansive views, we think they are clearly outdated in view of the limitations quoted from that case." (*Id.* at p. 149, fn. omitted.)

18

We conclude that Lopez's statements to the press were not privileged under section 47, subdivision (b), because they were not made to achieve the objective of her sexual harassment complaint submitted to the Assembly, but rather to announce her complaint to the public and publicize her view of the dispute.

*Fair and True Reporting Privilege*

We come to a different conclusion regarding the privilege under section 47, subdivision (d)(1), which provides in relevant part that a privileged publication includes one made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof . . . ." The privilege extends "to both a fair and true report in and a communication to a public journal concerning judicial, legislative or other public proceedings." (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 97 (*J-M Manufacturing*).) As with the privilege under section 47, subdivision (b), the fair and true reporting privilege "forecloses a plaintiff from showing a probability of prevailing on the merits" in opposition to an anti-SLAPP motion. (*Argentieri, supra*, 8 Cal.App.5th at p. 787; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 98.)

However, "[u]nlike the litigation privilege, the fair and true reporting privilege pertains specifically to communications to the press, and it requires that the report be fair and true, not that it actually further the underlying [proceeding]." (*Argentieri, supra*, 8 Cal.App.5th at p. 787; *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 241-242 (*Sipple*).)

" 'The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings.' [Citation.]" (*Burrill, supra*, 217 Cal.App.4th at p. 398.) " '[T]he publication is to be measured by the natural and probable effect it would have on the mind of the average reader [citations]. The standard of interpretation to be used in testing alleged defamatory language is how those

19

in the community where the matter was published would reasonably understand it [citation]. In determining whether the report was fair and true, the article [or broadcast] must be regarded from the standpoint of persons whose function is to give the public a fair report of what has taken place. The report is not to be judged by the standard of accuracy that would be adopted if it were the report of a professional law reporter or a trained lawyer [citation].' [Citation.]" (*Ibid.*; *Argentieri, supra*, 8 Cal.App.5th at p. 787; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 100.)

"In evaluating the effect a publication has on the average reader, the challenged language must be viewed in context to determine whether, applying a 'totality of the circumstances' test, it is reasonably susceptible to the defamatory meaning alleged by the plaintiff: ' "[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole." [Citation.] "This is a rule of reason. Defamation actions cannot be based on snippets taken out of context." ' " (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 100; *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975-976 (*McClatchy*) [the defendant "does not have to justify every word of the alleged defamatory material that is published," defendant's "responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed"].) " 'Only if the deviation is of such a "substantial character" that it "produce[s] a different effect" on the reader will the privilege be suspended. [Citation.] News articles, in other words, need only convey the substance of the proceedings on which they report, as measured by the impact on the average reader.' [Citation.]" (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351-352; *Argentieri, supra*, 8 Cal.App.5th at p. 790.)

" 'The fair report privilege is required because of the public's need for information to fulfill its supervisory role over government. Thus, reports of official proceedings are not privileged "merely to satisfy the curiosity of individuals," but to tell them how their government is performing.' " (*McClatchy, supra*, 189 Cal.App.3d at p. 975.) Courts

20

have liberally construed the fair and true reporting privilege.  (*Sipple, supra*, 71 Cal.App.4th at pp. 240-241; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 101; *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 431 (*Healthsmart*).)

We conclude that the fair and true reporting privilege applies to Lopez's press conference and to the statements attributed to her in the Los Angeles Times article.  As Lopez stated at the beginning of the press conference, the purpose of the conference was to announce that she had submitted a complaint to the Assembly Rules Committee that she was sexually assaulted by Dababneh.  The facts of that assault that Lopez related at the press conference are substantively the same as in her letter to the committee:  at a pre-wedding party at a Las Vegas hotel, Dababneh pushed Lopez into a restroom, blocked the door, and masturbated while urging her to touch him.  At the press conference, Lopez related her initial reluctance to name Dababneh and the circumstances that overcame that reluctance, including urging by the committee chair, Cooley, and other legislators for her to come forward and promising a fair process if she did.  Lopez's complaint also stated that she was stepping forward because Cooley encouraged her to do so.

Similarly, the Los Angeles Times article begins with the news item that Lopez had named Dababneh in a complaint to the Assembly ("Lopez had not publicly accused Dababneh until Monday, when she formally filed a complaint with the Assembly and named him at a news conference") and reported her allegations in the complaint ("Sacramento Lobbyist Pamela Lopez has claimed that, in 2016, Democratic Assemblyman Matt Dababneh followed her into a bathroom, masturbated in front of her and urged her to touch him.")  In the article, Lopez described that circumstances and events that led her to submit a complaint to the Assembly, a subject also referenced in her complaint.

In sum, the gist and sting of Lopez's statements at the press conference and in the article are substantively the same as the allegations in her complaint to the Assembly.  The average reader would reasonably interpret Lopez's statements to the press as

21

conveying that she had named Dababneh in a complaint alleging that he had forced her to watch him masturbate.  Moreover, Lopez's statements at the press conference and in the article about her complaint included an explanation why she overcame her reluctance to report Dababneh to the Assembly, thereby informing the public " 'how their government is performing.' " (*McClatchy, supra*, 189 Cal.App.3d at p. 975.)

Dababneh counters that " 'gist and sting' " cases are inapposite because he "does not contend that Lopez described the Report inaccurately" in statements to the press. Dababneh argues that "Lopez told the press that Dababneh had assaulted her *as a fact independent of the Report*."  Dababneh cites *Healthsmart,* in which the court said "[a]n attorney may not . . . make defamatory allegations in a complaint and then report the same alleged facts, *as facts*, to the media with impunity." (*Healthsmart, supra*, 7 Cal.App.5th at p. 435.)  "[S]tatements are privileged if they are fair and true reports *about the proceedings* or of what was *said in the proceedings.*  [Citations.]  There is thus a critical difference between communicating to the media what is alleged in the complaint and communicating the alleged facts without reference to the complaint." (*Ibid.*)  "The issue is whether the average viewer or listener of the media reports would understand the . . . statements as communications about the [underlying] complaint (which would be privileged) or as facts (which would not)." (*Id.* at pp. 435-436.)

We find that Lopez's statements to the press were not made as statements of fact without reference to her complaint to the Assembly and the average reader would understand her statements to refer to her complaint.  *Healthsmart*, in fact, is instructive. Dababneh argues, for example, that a "passing reference" to Lopez's complaint in the Los Angeles Times article "is separated by a dozen paragraphs from Lopez's lengthy narrative about the assault."  In *Healthsmart*, the defendant's initial statement in a television news report referred to "a conspiracy among the hospitals and doctors that 'we allege in the complaint,' " but "his subsequent statements do not mention the complaint or allegations . . . ." (*Healthsmart, supra*, 7 Cal.App.5th at p. 436.)  Noting that the news

22

reporter referred to the defendant as the attorney for the plaintiff in the underlying lawsuit and the report included background references to the suit, the court concluded that "[t]he average person watching the report in its entirety would reasonably understand that [defendant's attorney] was referring to the allegations in the lawsuit he filed on [his client's] behalf. Although some statements, when viewed in isolation, could be understood to communicate the allegedly defamatory matter as facts, not mere allegations of facts, when the media reports are viewed in their entirety and in the context in which they were made, the only reasonable conclusion is that the statements refer to allegations made in the [underlying] complaint." (*Ibid.*)

In this instance, both the press conference and the news article begin with a reference to Lopez's complaint to the Assembly that Dababneh sexually assaulted her. As mentioned, Lopez stated at the outset that the purpose of the press conference was to announce her sexual assault allegations against Dababneh. The headline of the article summarized its substance as "California assemblyman accused of forcing lobbyist into bathroom and masturbating." Lopez's complaint to the Assembly, the press conference and the publication of the article all occurred on the same day. The publication of the article—as indicated by its headline and introductory paragraph—was triggered by Lopez's complaint to the Assembly. As in *Healthsmart*, when Lopez's statements to the press are viewed in their entirety and in the context in which they were made, these statements would reasonably be understood to refer to the allegations in her complaint to the Assembly.

There is a marked contrast between the present circumstances and those in *Hawran* where the court found the fair and true reporting privilege did not apply to a press release. (*Hawran, supra*, 209 Cal.App.4th at p. 280.) In that case, the press release announced the completion of an internal investigation by a corporation's special litigation committee, summarized its conclusions, listed remedial measures, announced the termination or resignation of various officers (including Hawran), identified new interim

23

officers, and referred to a future presentation to the SEC. (*Ibid*.) The court found the "press release does not mention the subject SEC investigation, much less 'capture[ ] [its] substance, . . . "gist" or "sting" . . . .' [Citation.]" (*Ibid*.) The press release, including the alleged defamatory allegations about Hawran's resignation and denial of wrongdoing, did not "report on, summarize or describe the SEC proceeding," its history, or any statements made in the course of an SEC proceeding or investigation. (*Id.* at p. 281.) The press release simply reported the results and consequences of the company's internal investigation. (*Ibid.*) Though the release referred to a presentation to the SEC, it did not describe the presentation. (*Ibid.*) The court concluded that nothing in the release "gives us the 'gist' of the SEC's charges, if any, or the proceedings before it." (*Ibid.*)

Here, Lopez's complaint to the Assembly is the focus of her press conference and the Los Angeles Times article and, as Dababneh concedes, the gist or sting of that complaint is accurately described in her statements to the press on both occasions. (See *Argentieri, supra*, 8 Cal.App.5th at pp. 789-790.)

Dababneh also contends the fair and true reporting privilege should be rejected because "Lopez's press statements added numerous 'material facts,' including that Dababneh had 'expressed regret and disbelief' afterwards and that Lopez had told friends about the assault immediately after it happened."[5] We disagree. Assuming arguendo that

---

[5] Dababneh also cites to the fact section of his brief where he referred to Lopez stating at the press conference that "Dababneh had sexually harassed and abused other women." Dababneh, however, failed to allege in his complaint that Lopez defamed him by false statements to the press that he sexually harassed other women. "On review of a special motion to strike pursuant to [Code of Civil Procedure] section 425.16, we must take the complaint as it is. [Citation.]" (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1263 [where plaintiff contended in opposition to anti-SLAPP motion that defendant defamed her in a radio interview by a false statement that she had had an abortion, "whatever possible merit that claim may have, [plaintiff] failed to include it in her complaint"].)

these are "material facts," Lopez stated in her letter of complaint to the Assembly that "[i]t is not my intention to report every detail of what happened," and provided a "brief description." In other words, the allegations in the complaint were not presented as a detailed description of the alleged assault. We find the additional details of the assault communicated to the press do not change the gist or sting of the allegations of complaint and are therefore privileged.[6]

In *Sipple,* the plaintiff contended that " 'most of the statements in the article—and all of the most damaging ones—are simply absent from the court proceedings.' " (*Sipple, supra*, 71 Cal.App.4th at p. 245.) The court found "[t]he article, although it expands on specific incidents of abuse, does not change the gist or sting of the courtroom statements or the complexion of the affair." (*Ibid.*) Likewise here, Lopez's statements to the press, including that Dababneh expressed regret after the assault and that she disclosed the assault to friends at the time it happened, expand on the brief description of the incident in Lopez's complaint to the Assembly but do not alter the gist or sting of her allegations.

---

[6] Dababneh cites *Lyon v. Fairweather* (1923) 63 Cal.App. 194, 197-198, for the proposition that the "fair report privilege [is] inapplicable to [an] article which included paragraphs that 'do not purport to state any fact or facts developed in the judicial proceeding which the article purports to report.' " However, in *Handelsman v. San Francisco Chronicle* (1970) 11 Cal.App.3d 381, the court cited *Lyon* as stating the "well recognized principle that an alleged libelous article must be considered in its entirety . . . ." (*Id.* at p. 388; *Lyon, supra*, 63 Cal.App. at p. 197.) *Handelsman* also stated the "well recognized rule" that a report "substantially in accord" with the alleged defamatory matter in a judicial complaint is entitled to the fair and true reporting privilege. (*Handelsman, supra*, 11 Cal.App.3d at p. 386.) A report that captures "the gist, the sting" of the libelous charge, as measured "by the natural and probable effect it would have on the mind of the average reader" is a fair and true report. (*Id.* at p. 387.)

Because Lopez's statements to the press were absolutely privileged under section 47, subdivision (d), Dababneh cannot establish a probability of prevailing on his defamation claim.[7] (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 98.)

*Intentional Infliction of Emotional Distress*

The collapse of Dababneh's defamation claim spells the demise of his claim for intentional infliction of emotional distress, which arises from Lopez's statements regarding the alleged sexual assault. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 34.) "As the state Supreme Court observed, ' "to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly. It would also render meaningless any defense of truth or privilege." ' " (*Ibid.*, quoting *Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 245; see also *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 682; *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579.)

---

[7] Because we hold the absolute privilege applies, we have no occasion to consider whether the statements were made with actual malice or the *Noerr-Pennington* doctrine applies and do not address the parties' arguments on these issues. (*Healthsmart, supra*, 7 Cal.App.5th at p. 437.)

26

## DISPOSITION

The trial court's order is reversed. The cause is remanded to the trial court with directions to grant Lopez's special motion to strike and to conduct further proceedings in accordance with Code of Civil Procedure section 425.16. Lopez shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                                          /s/
                                    RAYE, P. J.

We concur:


    /s/
ROBIE, J.


    /s/
MAURO, J.

27