Filed 11/25/24  Bond v. Lilly CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GEOFFREY R. BOND,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>BRIAN LILLY, SR. et al.,<br><br>　　Defendants and Appellants. | D082738<br><br><br>(Super. Ct. No. 37-2023-00003481-CU-WT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Keri G. Katz, Judge.  Reversed and remanded.

Garcia Hong Law, Valerie Garcia Hong, Christina G. Bernstein, and Mark Simpliciano, for Defendants and Appellants.

Shegerian & Associates, Carney R. Shegerian and Jill McDonell, for Plaintiff and Respondent.

In a prior action, defendants Brenda Lilly and Brian Lilly, Sr. (the Lillys) sued University of California, San Diego's (UCSD) former men's rowing head coach Geoff Bond, associate athletic director Katie McGann, athletic director Earl Edwards, and the Regents of the University of California in federal court after their son Brian Lilly, Jr. (Brian), a UCSD

student rower, tragically died by suicide in January 2021. The Lillys alleged that UCSD and the named administrators were to blame for their son's death. Around the time the Lillys filed their lawsuit, they and their attorney provided interviews and statements to multiple news media outlets in which they claimed that Bond was an abusive coach and caused Brian's mental health issues, as they alleged in their federal complaint. Bond then sued the Lillys in state court for defamation and intentional infliction of emotional distress, alleging that the Lillys' statements to the media were false and defamatory. The Lillys now appeal from the trial court's order denying their special motion to strike as a strategic lawsuit against public participation (SLAPP) the two causes of action asserted by Bond against them. (Code Civ. Proc., § 425.16.[1])

The trial court found, and the parties agree, that the Lillys met their initial burden of showing that the allegedly defamatory statements were protected speech under the anti-SLAPP statute. The main question presented on appeal is whether the trial court correctly found that the Lillys failed to establish that their statements were protected by the fair and true report privilege, which shields from liability fair and true communications to the media of judicial proceedings or statements made in the course of judicial proceedings. (Civ. Code, § 47, subd. (d)(1).) The Lillys contend that their statements to the media about Bond were fair and true reports of the allegations in their federal complaint. If some or all of the Lillys' statements are not privileged, we must further determine whether Bond has met his

---

[1]    All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

responsive burden of showing a probability of prevailing on the merits of his claims as to any unprivileged statements.

On de novo review, we conclude that the fair and true report privilege applies to all but one of the allegedly defamatory statements made by the Lillys, and Bond has not shown a probability of prevailing as to the remaining statement. The trial court thus erred in denying the anti-SLAPP motion, and we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background as Alleged in Bond's Complaint*

Geoff Bond was the head coach of the UCSD men's rowing program from October 2019 to January 2022. In 2019, UCSD student Brian Lilly became a walk-on rower for the team.

In January 2020, rowing team captains reported to Bond that they had been approached by several women who said one of their rowing teammates, Z.B., had sexually harassed them. Brian became upset and suspicious about the way UCSD was handling the complaints against Z.B., so Bond called a meeting with Brian and a few others in the rowing program to discuss his concerns. Brian was angry that Z.B. had not been kicked off the team. In February 2020, there was an in-boat altercation between Brian and Z.B. during practice, after which Bond pulled the two of them aside and instructed them to control their behavior or leave the team.

In March 2020, UCSD's rowing season ended due to the onset of the COVID-19 pandemic. Brian returned to live with his parents in New York. At some point after returning home, Brian began to suffer from mental illness, and his mental health continued to decline in the coming months. He ultimately checked himself into a hospital to treat symptoms of schizophrenia and a psychotic episode. Brian underwent in- and out-patient treatment.

In June 2020, Brian responded to an anonymous UCSD survey distributed to members of the men's rowing team with a 23-page response containing allegations about Bond with the goal, as understood by Bond, of getting him removed as coach. In the survey response, Brian alleged misconduct by Bond and referenced the perceived mishandling of the Title IX complaints against Z.B.

In December 2020, Brian informed Bond that he was returning to UCSD for in-person learning but would be opting out of the rowing program for the winter quarter, with an intent to return for the spring season in April 2021. Brian returned to UCSD in or around late December 2020.

On January 4, 2021, Brian's mother called Bond and informed him Brian had died by suicide. Bond was heartbroken and offered Brenda his condolences. On January 15, Brenda texted Bond with a link to Brian's obituary and later thanked him for the "beautiful flowers from UCSD men's rowing." On January 16, Bond and other members of UCSD's men's rowing team attended Brian's funeral service, which was held via Zoom. After the funeral, Bond texted Brenda, "[i]t was a beautiful service, Brenda. Thank you for allowing us to join you." Brenda responded, "Thank you for being part of it."

In June 2021, Bond was informed that UCSD was conducting an investigation into Bond's time coaching at the University of Pennsylvania. However, they offered him a one-year contract renewal to continue coaching the men's rowing team, which Bond signed.

At some point after his contract renewal, Bond learned that Brian's parents had indicated their intent to file a wrongful death lawsuit against UCSD and himself, among others. On September 30, 2021, the Lillys filed their lawsuit in federal court, alleging in part that Bond caused Brian's

4

death.  On or around September 30, October 1, and October 5, the Lillys and their attorney made various statements about Bond's allegedly abusive conduct to news reporters that were quoted in three print news articles and one news video.

In January 2022, UCSD terminated Bond, stating that they wanted to take the rowing program in a different direction.

In December 2022, Bond filed his first amended complaint against the Lillys and the Regents of the University of California.  He asserted claims of whistle-blower retaliation in violation of Labor Code section 1102.5 as well as retaliation and failure to prevent retaliation in violation of the Fair Employment and Housing Act (Gov. Code, §12900, *et seq*.) against the Regents of the University of California, and claims of intentional infliction of emotional distress and defamation against the Lillys.

B.  *The Lillys' Anti-SLAPP Motion*

The Lillys filed a special motion to strike the two causes of action against them in Bond's first amended complaint under section 425.16, known as an anti-SLAPP motion.  The Lillys claimed that Bond's claims arose from protected activity under section 425.16, subdivisions (e)(l), (e)(2) and (e)(4), because their alleged conduct involved "statements 'made in connection with an issue under consideration or review by a . . . judicial body,' or statements 'made in a place open to the public or a public forum in connection with an issue of public interest,' or 'any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest.' "  They further argued that it was not probable Bond would prevail on the merits of his claims and that his claims were barred by the litigation privilege and the fair and true report privilege.

Bond argued in opposition that the litigation privilege did not apply because it does not extend to publications to the general public through the press; the fair report privilege did not apply because the Lillys failed to show that their original publication to the news media was made after they filed their complaint, none of their statements expressly referenced the lawsuit, and one of their statements was not contained in their complaint; the evidence showed that the Lillys' statements were false; and, in any event, the Lillys conceded Bond's prima facie case because their motion only contained argument regarding the litigation and fair report privileges.

The Lillys argued on reply that Bond had failed to provide admissible evidence that established a probability of prevailing on the merits and reiterated that his claims were barred by the litigation and fair report privileges.

C. *Trial Court Ruling*

The trial court held a hearing on the Lillys' anti-SLAPP motion and, shortly after, adopted its tentative ruling denying the motion. The court first rejected the Lillys' litigation privilege argument, finding that although the content of the Lillys' alleged statements was related to their lawsuit, they failed to establish how their statements had a "functional connection" to the lawsuit as required under *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1146.

The trial court also agreed with Bond that for the fair report privilege to apply, the Lillys were required to establish their statements to the news outlets were made after they filed their lawsuit. The court found that "the critical issue is not the contents of these publications, but the timing of the statements made by the Lillys to the news media outlets . . . . In this circumstance, to invoke the fair report privilege, the Lillys must establish

6

that the initial publication to the news media outlets was made after the Lillys filed their federal court action. Absent establishing the timing of the Lillys' alleged statements to the news media outlets, the court finds the Lillys fail to meet their burden of establishing that Plaintiff's Defamation and IIED causes of action are barred by the fair report privilege."

Finally, the trial court accepted Bond's argument that the Lillys' anti-SLAPP "motion was limited to the litigation privilege and the fair report privilege." It therefore declined to address the question of whether Bond had established a probability of prevailing on the merits of his claims.

DISCUSSION

I

A. *Anti-SLAPP Legal Principles*

California's anti-SLAPP statute authorizes a special motion to strike any claim "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Subdivision (e) of section 425.16 sets forth four categories of protected activity: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right

7

of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(1)–(4).)

Our review of an order granting or denying an anti-SLAPP motion is de novo and involves a two-step process. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061, 1067.) We first determine whether the defendant has established that the challenged claim arises from activity protected under section 425.16. (*Id.* at p. 1061.) If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merits of the claim by establishing a probability of success. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Our review at this second step is similar to our review of a ruling on a summary judgment motion. (*Ibid*.) We accept the plaintiff's evidence as true and consider the defendant's evidence only to determine whether it defeats the challenged claim as a matter of law. (*Id.* at p. 385.) Claims with at least minimal merit may proceed. (*Ibid*.)

The parties agree with the trial court that Bond's claims arise from protected activity. Bond did not dispute this point below, nor does he do so on appeal. We therefore assume the Lillys met their burden at the first step of the anti-SLAPP analysis and move directly to the second step to determine whether Bond has shown that his claims have merit.

B. *Probability of Prevailing*

The Lillys contend Bond cannot establish a probability of prevailing on his claims for several reasons. First, they argue that the fair and true report privilege applies to the allegedly defamatory statements and therefore precludes a finding for Bond on the merits. Second, even if the privilege does not apply, Bond was a limited purpose public figure and was therefore required to show that the statements were made with malice. Third, Bond failed to establish that the statements were false. Finally, the allegedly

defamatory statements were nonactionable opinion. The Lillys further argue that because Bond's intentional infliction of emotional distress claim is derivative of his defamation claim, it must also fail.

We find the Lillys' first argument to be dispositive as to all but one of the allegedly defamatory statements. As to the one remaining statement, we conclude that Bond has failed to show a probability of prevailing on either his defamation or his intentional infliction of emotional distress claim.

1. *The Fair and True Report Privilege*

The Lillys contend Bond cannot prevail on his claims against them because their allegedly defamatory statements are privileged under the fair and true report privilege. Under Civil Code section 47, subdivision (d)(1), the fair report privilege protects a " 'fair and true report in, or a communication to, a public journal, of . . . a judicial . . . proceeding, or anything said in the course thereof.' " (*Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 787 (*Argentieri*).) The fair and true report privilege is "absolute"—"that is, it applies regardless of the defendants' motive for making the report—and forecloses a plaintiff from showing a probability of prevailing on the merits." (*Ibid*.) We thus analyze the Lillys' claim of the fair and true report privilege first. As the defendants, the Lillys bear the burden of proving the applicability of the privilege. (*Hawran v. Hixon* (2012) 209 Cal.App.4th 256, 278.)

"In general, whether a privileged occasion exists within the meaning of Civil Code section 47, subdivision (d), is for the court to decide; whether the report of the official proceedings itself is 'fair and true,' provided reasonable minds could disagree as to the effect of the communication on the average reader or listener, is a question of fact for the jury." (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 98 (*J-M*

9

*Manufacturing*).)  That said, "case law indicates this decision is one of law when, as here, there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the report." (*McClatchy Newspapers v. Superior Court* (1987) 189 Cal.App.3d 961, 976; *id.* at pp. 976–977 [reversing denial of summary judgment].)  And although determining whether a communication is privileged "may properly be left to a jury in some instances, appellate courts have not been reluctant to decide the fair report privilege applies as a matter of law when the undisputed facts are insufficient to support a judgment for the plaintiff." (*J-M Manufacturing*, at p. 99.)  As we will explain, we conclude this case is one where the privilege applies as a matter of law.

Courts have liberally construed the fair report privilege.  (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 101.)  They have also construed the phrase "judicial proceeding" broadly to include the filing of a complaint. (*Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 432 (*Healthsmart*).)  Although the fair report privilege is more often invoked by news media defendants, it also protects those who, like the Lillys, communicate information about a judicial proceeding to the media.  (*Id.* at p. 431.)  "Indeed, the Legislature's explicit purpose for enacting a 1996 amendment to [Civil Code] section 47, subdivision (d), was to protect such intermediaries." (*Ibid.*)  The amendment was enacted to abrogate the holding in *Shahvar v. Superior Court* (1994) 25 Cal.App.4th 653 (*Shahvar*) that an attorney's transmittal of a copy of a pleading to a newspaper was not protected by the fair report privilege.  (*Healthsmart*, at pp. 431–432; Stats. 1996, ch. 1055, §§ 1, 2, pp. 6641–6642.)[2]  The amendment codified "a type of

_____

[2]    The Legislature's intent in enacting this amendment was not only to abrogate *Shahvar*, but also "to preserve the scarce resources of California's

10

'bridge privilege' between the litigation privilege and the fair report privilege . . . to protect a third party who communicates this already privileged material to the press." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1540 (1995–1996 Reg. Sess.) as amended June 26, 1996, p. 5; see also *Healthsmart*, at p. 432.) Fair and true communications to the media about allegations in a complaint are thus covered by the privilege. (*Healthsmart*, at p. 432.)

Bond does not dispute this principle, but he argues as an initial matter that the Lillys were required to prove their communications to the media were made *after* their complaint was filed. The trial court accepted this argument, finding that to invoke the fair report privilege, the Lillys had to "establish that the initial publication to the news media outlets was made after the Lillys filed their federal court action." Because they failed to do so, the court found that the Lillys did not meet their burden of establishing that Bond's defamation and intentional infliction of emotional distress claims were barred by the fair report privilege.

We disagree. The statutory language refers to a communication "of" statements made in a judicial proceeding. (Civ. Code, § 47, subd. (d)(1).) A report to the media fairly and truthfully describing the allegations of a complaint that is actually filed in court constitutes a communication "of" statements made in a judicial proceeding—even if the report is made in anticipation of the filing for a news story to be published later. "Liberally construing the fair report privilege, as have prior appellate decisions" (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 101), we conclude the statutory

---

courts, to avoid using the courts for satellite litigation, and to increase public participation in the political, legislative, and judicial processes." (1996 Cal. Legis. Serv. Ch. 1055.)

language does not include any timing requirement for the fair and true report to the media.

One need only read the title of each news article at issue here to see that the news outlets that published the Lillys' statements did so *because* a lawsuit was filed: "Lawsuit alleges bullying, abuse by UC San Diego rowing coach led to student's suicide" (Sept. 30, 2021 San Diego Union Tribune article); "Lawsuit alleges that bullying and abuse by UC San Diego rowing coach led to student's suicide" (Oct. 1, 2021 La Jolla Light article); "Lawsuit Claims Bullying, Verbal Abuse Led to UC San Diego Athlete's Suicide" (Oct. 5, 2021 NBC 7 San Diego article). It is clear from the record that the Lillys made their statements to the reporters with the understanding that the news outlets would be running stories about their complaint. Regardless of exactly which day the Lillys made their statements, the fact remains that a complaint *was* filed, the news articles were written *about* the allegations in that complaint, and they were published the same day the complaint was filed or within days after its filing. We are not aware of any authority requiring proof of the precise timing of the alleged defamatory statements made to news reporters about a complaint that is actually filed, and we do not believe the timing is or should be dispositive so long as they were fair and true reports of the allegations in the filed complaint.

This result is consistent with case law construing another related provision of Civil Code section 47. In the context of the litigation privilege within the same statute (Civ. Code, § 47, subd. (b)), courts have consistently held that as long as the privileged statement has "some relation to an imminent lawsuit or judicial proceeding which is *actually* contemplated seriously and in good faith to resolve a dispute, and not simply as a tactical ploy to negotiate a bargain," the timing of the statement in relation to the

12

filing of the complaint is not material. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36 (*Edwards*); see also *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1059 ["[t]he fact that cross-complaints had not yet been filed . . . is irrelevant" to the question of whether the communications about the contents of the cross-complaints that were ultimately filed were privileged].)  This is so even though "[t]he language of section 47(b) itself expressly applies only to communications made '[i]n any . . . judicial proceeding' " and "includes nothing about communications made in a prelitigation context, that is, *before* suit is filed." (*Edwards*, at p. 30.)  We see no reason why this rule should not apply to the fair report privilege as well.  (See *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 960 ["Ordinarily we interpret related statutory provisions on the assumption that they each operate in the same manner . . . ."].)

Our reading of the statute also promotes the intent of the 1996 amendment.  As noted, the Legislature amended the law in 1996 for the specific purpose of creating a " 'bridge' between the litigation privilege . . . and the fair report privilege" by protecting those who communicate information about litigation to the media. (*Healthsmart, supra*, 7 Cal.App.5th at pp. 431–432.)  To subject people to liability for fair and true reports to the media just because they were made in anticipation of a lawsuit that was actually filed, rather than after it was filed, would frustrate this purpose.  It would also undermine the goals of the 1996 amendment to preserve court resources, prevent use of the courts for satellite litigation, and increase public participation in the judicial process.  (1996 Cal. Legis. Serv. Ch. 1055.)  We therefore conclude that, under these circumstances, the Lillys

13

were not required to provide proof of the exact timing of their communications to the media about the complaint they filed in federal court.

The question remaining before us, then, is whether the Lillys' communications to the media were fair and true. As the *Healthsmart* court explained, " '[f]air and true' in this context does not refer to the truth or accuracy of the matters asserted in the judicial proceedings, but rather to the accuracy of the challenged statements with respect to what occurred in the judicial proceedings. . . . Thus, we are not concerned with either the merits of [the Lillys'] allegations or the truth of [their] statements to the media about [Bond], but rather the extent to which the . . . statements accurately conveyed the substance of the allegations made in the [Lillys'] complaint." (*Healthsmart, supra*, 7 Cal.App.5th at p. 434.) To qualify as a fair and true report of a judicial proceeding, a publication need not track the allegations word for word. Rather, the privilege applies if the statements "reflect the gist or sting" of the allegations. (*Id.* at p. 435.) The accuracy of the report is measured by the "natural and probable effect the statements would have on the average person reading, viewing, or listening to the report." (*Id.* at p. 434; see also *Argentieri, supra*, 8 Cal.App.5th at p. 787.)

We have identified 15 separate statements made to the media by the Lillys or their attorney[3] that Bond alleges were defamatory. Each of these

---

[3] The Lillys argue in a footnote that Bond's defamation claim cannot be based on any statement not made by the Lillys themselves because he is required to prove they were the utterers of the defamatory statements. The case they cite in support of this argument, *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, does not stand for this proposition. In any event, Bond alleged in his complaint that the Lillys' attorney was acting as their agent. Given our conclusion that each of the allegedly defamatory statements made by people other than the Lillys is privileged, however, we need not decide the issue.

14

statements appeared in one or more of three publications on the date the Lillys filed their federal complaint or within days afterwards: the September 30, 2021, San Diego Union Tribune news article, the October 1, 2021 La Jolla Light news article, and the October 5, 2021 NBC San Diego news article and video. The Lillys argue that the statements clearly report, summarize, or describe the allegations in their federal lawsuit, which was filed on September 30, 2021, and the fair report privilege therefore applies as a matter of law. The following chart compares the allegedly defamatory statements with the allegations in the Lillys' original complaint:

| | Alleged Statement | Federal Complaint Allegation |
|---|---|---|
| 1 | "[Bond] fat-shamed him. He called him 'fat Brian' multiple times." | ¶ 100: "Decedent, as described above, had previously struggled with serious weight issues. Decedent[] struggled as he was pelted with consistent 'fat' jokes from Bond and tried to maintain the narrow weight limits the coach demanded of his rowers." |
| | | ¶ 151: "Bond repeatedly mocked and harped on Decedent's weight, preying on the 19-year old's extreme sensitivity about his weight. Though Decedent overcame his weight struggles and obesity from middle school, and presented as a physically fit, Iron Man, Bond often referred to him as 'Fat [Decedent's name]' [to] hurt and humiliate Decedent." |
| 2 | "[Bond] knew that Brian had had a weight issue in his youth and that was something that he had worked very, very hard on and was really proud of clean | ¶ 70 and fn. 2: "[Brian] struggled with a new BMI that qualified Decedent as obese, causing him to lose confidence and, sadly, some friends in his early teenaged years. While he was eventually able to lose the weight, and keep it off, Decedent remained susceptible to body shaming throughout his life. [¶] . . . [¶] Decedent shared the pain, |

15

| | | |
|---|---|---|
| | eating and he really espoused that because it changed his life." | and shame, he felt from his childhood obesity with his coaches and friends on the rowing team throughout his freshman year. Though the obesity was in the rearview, Decedent was clearly sensitive to his former unhealthy stature, feeling inferior whenever reminded of same. Unfortunately for Decedent, the reminders came often from Bond, after the relentless bully recognized the pain, he could inflict from this sore spot." ¶ 151: "Bond repeatedly mocked and harped on Decedent's weight, preying on the 19-year old's extreme sensitivity about his weight. Though Decedent overcame his weight struggles and obesity from middle school, and presented as a physically fit, Iron Man, Bond often referred to him as 'Fat [Decedent's name]' [to] hurt and humiliate Decedent." |
| 3 | "[Bond was] a repeat offender, he had a problem at UPenn and that didn't turn out well for Bond and it's documented." | ¶¶ 28–29: "Bond would, again, leave a seemingly prestigious position after a short tenure as coach. Upon information and belief, Bond lasted three years before being forced out of UPenn when approximately 25 of the rowers he coached threatened to quit unless Bond was removed. . . . [T]he student athletes at UPenn refused to continue to row under Bond due to his verbal abuse. Bond was a known bully within the UPenn rowing program. He regularly made sexually explicit, offensive remarks, and lobbed politically incorrect insults at his rowers." |
| 4 | "Then [Brian] became persona non grata to Bond and then anyone who was under Bond's control. [¶] [Brian] was given the cold shoulder or if he got | ¶ 144: "Bond, as well as the coaches and captains who served at the head coach's pleasure treated Decedent as an enemy of the rowing program [from late January 2020 on]. The team leaders grew increasingly cold toward Decedent [throughout 2020] and |

16

| | | |
|---|---|---|
| | any attention, it was completely negative, insulting and debasing him; make him feel like he was not part of the team and not a real a man [*sic*] or a real rower. | alternated between treating him with outward hostility and cold ostracism." ¶ 150: "Bond attacked Decedent with consistent insults: calling him a 'pussy'; doubting Decedent's 'manliness,' 'testicular' fortitude or 'testosterone levels'; claiming Decedent was weak, immature, and questioning Decedent's dedication to the rowing team." ¶ 152: "When Bond was not mocking Decedent, or trying to make him vomit in workouts, he was intentionally cold and dismissive to the freshman, often suggesting he should leave the team activity or sending him away from a practice or a meeting. . . . [T]he emotional banishment, ostracism, and general disregard from Bond, as well as the coaches and captains under his control, had a severely detrimental impact on Decedent." |
| 5 | "Brian Lilly had been demoted to a developmental boat even though his score was above that position." | ¶ 147: "In late January 2020, however, . . . Decedent was inexplicably and without notice placed for the first time, in the fourth, bottom boat with rowers who had higher (worse) erg scores and far worse race performance than Decedent. ¶ 148: "Decedent, ever the solid teammate, responded to the demotion by taking it as a challenge, without complaint, and attempted to inspire fellow members of the fourth boat." |
| 6 | "The school failed Brian, OK. We don't want that to happen to anyone else. At this point, the best thing is for Geoff Bond to be taken out of coaching." | ¶ 277: "The negligent hiring, and supervision, of Bond, by McGann, Edwards and Defendants, resulted in the constant abuse and bullying of Decedent, and other rowing team members, by Bond and those under his control." ¶ 279–280: "Defendants compounded the hiring failure by failing to appropriately supervise Bond, particularly McGann and |

17

|  |  | Edwards as the coaches' supervisors, as described further below.  [¶]  Defendants, including McGann and Edwards, owed Decedent, and all students, a duty to maintain a safe environment, free from the hostility, abuse, bullying, psychological warfare and retaliation described herein."  (See also ¶¶ 281–285, 291–300.) |
|  |  | ¶ 292: "McGann and Edwards failed to discipline Bond and otherwise permitted the coach to terrorize and abuse the student athletes at UCSD, including Decedent."  (See also ¶ 276.) |
|  |  | Prayer for relief: "Plaintiff's [*sic*] demand judgment against Defendants as follows . . . injunctive relief directing University of California San Diego, Board of Regents of University of California . . . to terminate Geoff Bond[.]" |
| 7 | "[T]here was a pattern of mind games [by Bond]." | ¶ 223: "The adverse actions undertaken by Bond . . . included without limitation:  [¶] a. Subjecting Decedent, and other rowing team members, to . . . mind games that were detrimental to the student athlete's well-being." |
|  |  | ¶ 227: "[T]he frequent mean-spirited insults, mind games, unfair relegation of Decedent off the varsity boats and the emotional exile, caused Decedent to experience severe deterioration of his mental health . . . ." |
|  |  | ¶ 235c: "Bond played frequent mind games with Decedent, purposely confusing him, and causing him physical pain." |
| 8 | "So [Brian] finishes the piece, his friend gives him the paper towels, he's cleaning up and you know what | ¶ 103: "Bond consistently made team members feel like failures to enforce compliance with his orders.  A frequent example was Bond's encouraging Decedent, and others, to vomit during unnecessarily |

18

| | | |
|---|---|---|
| | coach Bond says, he says to my son, 'Throwing up is for sissies.' You want to talk about breaking a kid down, after he was just working so hard that he threw up on the machine." | grueling workouts. Bond first glorified rowers who worked out 'so hard they puked,' then, after successfully inducing vomit, Bond would laugh and dismiss them as 'pussies' for vomiting."<br><br>¶¶ 106–107: "Decedent worked out on an erg rowing machine until he threw up on November 25, 2019, seeking approval from Bond, after hearing of the rower from Berkeley his coach glorified. [¶] Immediately after Decedent vomited, Bond . . . mocked the 19-year-old, derisively laughing while saying '[t]hrowing up is for pussies.' " |
| 9 | "It's psychological torment. These kids don't know what to do. You know, they honor him. They want to do everything that he tells them to do." | ¶¶ 96–97: "Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable. It went well beyond the realm of even the most aggressive coaching. [¶] The student athletes lived in fear of Bond's constant, unprovoked rage-filled outbursts that were peppered throughout practices with the above demeaning words."<br><br>¶ 103: "Bond consistently made team members feel like failures to enforce compliance with his orders."<br><br>¶ 108: "Bond's coaching 'style' was insulting, demeaning, and rooted in a willful disregard for his rowers' health."<br><br>¶ 163: "Decedent, again growing emotional, informed Bond that 'this feels like psychological abuse[.]' "<br><br>¶ 258: "Bond bullied, harassed, and psychologically abused Decedent so thoroughly that Decedent, who never suffered from mental health issues before his freshman year, suffered from the worsening mental health[.]" |

19

| 10 | "Brian did not have any mental health issues before he met Geoff Bond." | "Defendants' conduct caused a deterioration of Decedent's mental health, including despair, paranoia, and confusion. Decedent experienced mental illness, warranting hospitalization, for the first time in his life." |
| | | ¶ 76: "Decedent had no mental health issues prior to his enrollment at UCSD." |
| | | ¶ 258: "Bond bullied, harassed, and psychologically abused Decedent so thoroughly that Decedent, who never suffered from mental health issues before his freshman year, suffered from the worsening mental health[.]" |
| 11 | "Lilly's parents said they . . . never received condolences from Coach Bond after Brian Lilly's death." | None |
| 12 | "The Lillys . . . said their son reached out to coaches and athletics department staff several times with his concerns about the team and Bond's alleged abusive and erratic behavior, including in a lengthy anonymous athletics department survey, but the school failed to address them." | ¶¶ 191–193: "In April of 2020, Decedent filled out an allegedly anonymous UCSD survey upon McGann's request, to receive feedback from the men's rowing team members. Decedent responded with twenty-three pages outlining Bond's misconduct . . . . Decedent's survey response reiterated the concerns he shared on the phone with McGann weeks earlier. [¶] Neither McGann, nor Edwards, nor any other supervisor at Defendant UCSD addressed the coaches' failure to report the sexual misconduct allegations to Title IX, or their abuse, bullying, and harassment, including sexual harassment, by Bond, at any point in time. [¶] McGann was aware of the abuse by Bond . . . ." |

| | | |
|---|---|---|
| | | ¶ 292: "McGann and Edwards failed to discipline Bond and otherwise permitted the coach to terrorize and abuse the student athletes at UCSD, including Decedent." |
| 13 | "It bothers me every day to think my son was the victim of a bully predator coach." | ¶¶ 90–91: "Bond was not an effective coach, teacher, leader, or mentor. He was a sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly. The rowers were subjected to sexually inappropriate comments, petty insults, and erratic behavior. [¶] Bond would soon view Decedent as an enemy . . . . Decedent's integrity incensed Bond, causing him to take numerous adverse actions against the brave teenager who stood up for what he believed in. As time went on, Bond's vitriol towards Decedent became constant, and far more intense than what his teammates experienced." |
| 14 | "Geoff Bond's conduct reveals he is not worthy of the lofty position of head coach . . . Bond did not care to build this kid up; he used his power to break Brian down." | ¶¶ 90–91: "Decedent, and his fellow freshmen rowers, quickly learned what the UPenn rowers had endured under Bond: Bond was not an effective coach, teacher, leader, or mentor. He was a sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly. The rowers were subjected to sexually inappropriate comments, petty insults, and erratic behavior. [¶] . . . Bond would soon view Decedent as an enemy . . . . Decedent's integrity incensed Bond, causing him to take numerous adverse actions against a brave teenager who stood up for what he believed in. As time went on, Bond's vitriol towards Decedent became constant, and far more intense than what his teammates experienced." <br><br> ¶¶ 96–97: "In rowing, as in other sports, 'tough love' and aggressive challenges can be |

| | | the norm, but Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable.  It went well beyond the realm of even the most aggressive coaching.  [¶] The student athletes lived in fear of Bond's constant, unprovoked rage-filled outbursts that were peppered throughout practices with the above demeaning words.  Bond would intentionally target a single rower, or coxswain, to publicly humiliate the student in front of teammates, among others." |
| | | ¶¶ 101–102: "Bond harassed rowers and mocked them with politically incorrect remarks when they suffered physical injuries, extreme exhaustion, or sickness from workouts.  On at least one occasion, Bond screamed at a freshman walk-on for seeking treatment from a team trainer for an injury, and then screamed again at the walk-on for following the team trainer's instructions.  [¶]  Bond pushed Decedent and his teammates past their limits, exhibiting a disregard for the rowers' general well-being." |
| 15 | "[Bond] was an abusive bully who subjected his rowers to terrifying temper tantrums, mean-spirited insults, and countless mind games." | ¶ 90: "Bond was . . . a sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly." |
| | | ¶¶ 96–97: "In rowing, as in other sports, 'tough love' and aggressive challenges can be the norm, but Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable.  It went well beyond the realm of even the most aggressive coaching. . . . The student athletes lived in fear of Bond's constant, unprovoked rage-filled outbursts that were peppered throughout practices with the above demeaning words.  Bond would intentionally target a single rower, or |

22

|  |  | coxswain, to publicly humiliate the student in front of teammates, among others." |
|  |  | ¶ 235: "The hostility and abuse described herein included, but was not limited to, the following:  [¶]  a. Subjecting Decedent, and other rowing team members, to more frequent and severe bullying and verbal abuse consisting of personal attacks, sexually charged insults and mind games that were detrimental to the student athlete's well-being.  The targeted bullying and verbal abuse of Decedent by Bond included sexually inappropriate insults lodged at Decedent, calling him a 'pussy,' as well as loudly questioning Decedent's 'manliness', 'testicular' fortitude, and insufficient 'testosterone levels;' Bond attacked Decedent's integrity, character, and mental make-up, as he called the teenager weak, untrustworthy and immature, then unfairly challenged Decedent's dedication to the rowing team." |

We believe that these statements, with one exception we address below (number 11 on the chart), sufficiently reflect the substance of the allegations in the Lillys' complaint to be considered fair and true.  As the Supreme Court has explained, a defendant is "permit[ted] a certain degree of flexibility/ literary license" when it comes to the statements.  (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 262, fn. 13.)  "[A] slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently than the actual truth would."  (*Ibid.* [cleaned up]; see also *Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337 (*Balzaga*) ["[t]he privilege applies if the substance of the publication or

broadcast captures the gist or sting of the statements made in the official proceedings"].) There can be no dispute that, with one exception, the above statements made to the news outlets "were substantially similar to the allegedly defamatory statements made in the [Lillys'] complaint" in the federal action. (*Healthsmart, supra*, 7 Cal.App.5th at p. 435.)

Bond argues that none of the Lillys' statements expressly mentions their complaint or references their lawsuit, so they are not communications *about* a judicial proceeding, and the privilege therefore does not apply. He relies on *Healthsmart*, where the court explained there is "a critical difference between communicating to the media what is alleged in a complaint and communicating the alleged facts without reference to the complaint." (*Healthsmart, supra*, 7 Cal.App.5th at p. 435.)

We agree with Bond that *Healthsmart* is instructive here, but that does not lead us to his desired result. In *Healthsmart*, one of the defendant attorneys made allegedly defamatory statements in a television news report. In his initial statement to the reporter, the defendant referred "to a conspiracy among the hospitals and doctors that 'we allege in the complaint,' " but his subsequent statements did not mention the complaint or allegations. (*Healthsmart, supra*, 7 Cal.App.5th at p. 436.) However, the news reporter identified the defendant as the attorney for the plaintiff in the underlying lawsuit at the outset of the report, images of the complaint were shown in the background, and the defendant's statements were "interspersed among the reporter's frequent references to the [underlying] lawsuit." (*Ibid.*) The court therefore concluded that "[t]he average person watching the report in its entirety would reasonably understand that [defendant] was referring to the allegations in the lawsuit . . . ." (*Ibid.*)

We reach the same conclusion here. The key question is what natural and probable effect the publication would have on the average reader or viewer. Although the Lillys themselves did not expressly mention their complaint, each of the three news articles is titled in a way that makes it immediately clear to the reader that the article is about allegations in a lawsuit. And as in *Healthsmart*, the Lillys' "statements are interspersed among the reporter's frequent references to the [underlying] lawsuit." (*Healthsmart, supra*, 7 Cal.App.5th at p. 436.) The San Diego Union Tribune article, as an example, is replete with references to the Lillys' lawsuit. The words "lawsuit," "claims," "sued," and "allegations" or "alleges" appear approximately 24 times in the seven-page article. The article repeatedly references the court action using phrases such as "according to the lawsuit," "the lawsuit states," and the "suit further alleges." As the court found in *Healthsmart*, "[a]lthough some statements, when viewed in isolation, could be understood to communicate the allegedly defamatory matter as facts, not mere allegations of facts, when the media reports are viewed in their entirety and in the context in which they were made, the only reasonable conclusion is that the statements refer to allegations made in the [underlying] complaint." (*Healthsmart*, at p. 436.) Viewing the Lillys' statements in the context of each article in its entirety, we do not believe the Lillys were required to preface each utterance with the incantation "the complaint alleges" for a reader to understand they were describing the basis for their complaint.

Bond seeks to avoid this conclusion by distinguishing between the "[t]wo levels of publication": the Lillys' publication of their statements to the reporters and the reporters' publication of the statements to the public. But if we follow Bond's reasoning, we must look at the natural and probable effect of the Lillys' statements on the average reporter hearing their statements.

25

No news reporter could reasonably understand the Lillys to be stating anything other than allegations of facts when the reporter is interviewing them *about* the allegations in the lawsuit they filed, for the news article that is being written *about* that lawsuit.

To the extent Bond argues the average reader would take the Lillys' statements as separate from the rest of the reporters' statements in the news articles and understand only the Lillys' statements to be factual while understanding the rest of the articles' statements to refer to the allegations, we reject this argument for the same reasons articulated by the *Healthsmart* court and many other courts before it. "In evaluating the effect a publication has on the average reader, the challenged language must be viewed in context to determine whether, applying a totality of the circumstances test, it is reasonably susceptible to the defamatory meaning alleged by the plaintiff: a defamatory meaning must be found, if at all, in a reading of the publication as a whole. This is a rule of reason. Defamation actions cannot be based on snippets taken out of context." (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 100 [cleaned up]; see also *Balzaga, supra*, 173 Cal.App.4th at p. 1338.)

For these reasons, we conclude that 14 of the 15 allegedly defamatory statements attributed to the Lillys are protected by the fair and true report privilege, and Bond is thus barred from litigating claims based on these statements.

2. *Whether Bond Has Shown Minimal Merit as to the Unprivileged Statement*

Our conclusion that all of the Lillys' allegedly defamatory statements but one are protected by the fair report privilege still requires us to determine whether Bond has shown that his claims have minimal merit as to the sole remaining statement: that the Lillys never received condolences from

26

Bond after their son's death. Specifically, Bond claims that the following statement in the NBC 7 news article is defamatory: "Since February, Lilly's parents said they haven't heard any updates on the investigation and never received condolences from coach Bond after Brian Lilly's death." This statement was not included in the allegations of the federal complaint.

As an initial matter, we disagree with Bond that the Lillys forfeited their right to argue that his claims lacked merit by failing to raise those arguments until their reply brief below. Under the anti-SLAPP analysis, once the Lillys demonstrated that Bond's claims were based on protected speech, the burden automatically shifted to Bond to demonstrate minimal merit, and the trial court was required to undertake the step two analysis. (*Baral, supra*, 1 Cal.5th at p. 384.) We are unpersuaded by the case Bond cites in support of his contention. *Maleti v. Wickers* (2022) 82 Cal.App.5th 181, 227–228, involved a belated argument from the defendants that their anti-SLAPP motion should be granted because the plaintiff had failed to adequately plead standing. It did not involve any argument as to the likelihood of prevailing on the merits of the claims at issue, and it is therefore inapposite.

Turning to the merits of Bond's defamation claim, he was required to set forth evidence admissible at trial demonstrating the publication of a false statement of fact that has a natural tendency to injure his reputation or that causes special damage.[4] (*J-M Manufacturing, supra*, 247 Cal.App.4th at

---

[4] The Lillys argue that Bond is a limited purpose public figure, and he therefore must additionally prove that they acted with malice. We agree with Bond that the Lillys forfeited this argument, as they did not raise it with the trial court. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 [contentions or theories raised for the first time on appeal are not entitled to consideration].)

p. 97.)  We agree with Bond that the Lillys' statement that he did not offer condolences after Brian's death is one of fact capable of being proved false, and he submitted admissible evidence showing it could be false.  But even if the statement was false, we conclude that it does not have "a natural tendency to injure" Bond's reputation, and he is therefore not likely to prevail on his defamation claim.

For defamation claims based on slander, a statement has a natural tendency to injure if it: (1) charges a person with a crime or states they were "indicted, convicted, or punished for a crime"; (2) imputes on a person "the present existence of an infectious, contagious, or loathsome disease"; (3) tends to directly injure a person "in respect to [their] office, profession, trade or business, either by imputing to [them] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to [their] office, profession, trade, or business that has a natural tendency to lessen its profits"; or (4) imputes on a person impotence or a want of chastity.  (Civ. Code, § 46; *Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361, 367 (*Regalia*).)  "A slander that falls within the first four subdivisions of Civil Code section 46 is slander per se and requires no proof of actual damages."  (*Regalia*, at p. 367.)

Bond did not argue below or on appeal that the Lillys' statement has a natural tendency to injure (i.e., that it falls under one of the four categories listed in Civil Code section 46), nor did he submit admissible evidence in support of this element of his claim.  The only category that could be relevant here is in subdivision (3) of Civil Code section 46.  We therefore must evaluate the Lillys' statement to determine if upon its face it "clearly convey[s] a meaning" that fits within that category, and therefore is slander

28

per se.  (*Regalia, supra*, 172 Cal.App.4th at pp. 369–370.)  We conclude that it does not.

Most of the cases that fit within the category of injury to business reputation "involve statements that reflect on the integrity and competence of the plaintiff, the clearest being allegations of unethical activity or incompetence. . . .  'Courts seem to be looking for conduct that might be deemed to reflect character or at least habitual misconduct rather than a passing peccadillo.' "  (*Regalia, supra*, 172 Cal.App.4th at p. 369 [reversing judgment for plaintiff on defamation claim because the statement that plaintiff was fired because other employees would not work for him is not slander per se; that some employees do not want to work for someone, without more, does not necessarily reflect adversely on the person].)  We recognize that a college rowing coach who does not offer condolences to the parents of a deceased student athlete could be viewed as uncaring, which is not necessarily a desired characteristic of a college coach.  But we cannot say it is a fact that reflects habitual misconduct or would disqualify Bond as a coach such that it is defamation per se.  Nor has Bond alleged any special damage resulting from the statement.  We therefore conclude that Bond has not demonstrated a probability of success on the merits of his defamation claim.  (See *Baral, supra*, 1 Cal.5th at p. 384.)

We similarly conclude Bond's claim for intentional infliction of emotional distress is without merit.  A party seeking to establish a cause of action for intentional infliction of emotional distress must show (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) that the plaintiff suffered severe or extreme emotional distress, and (3) that the defendant's outrageous conduct actually and proximately caused the extreme

29

emotional distress.  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.)  Conduct is "outrageous" for purposes of this claim when it is so "extreme as to exceed all bounds of that usually tolerated in a civilized community."  (*Id.* at pp. 1050–1051 [cleaned up].)  Falsely stating that the plaintiff did not offer condolences to the family of someone who died is not extreme and outrageous conduct under this high standard.  We conclude that Bond cannot prevail on his intentional infliction of emotional distress claim.

## II

The Lillys argue they are entitled to recover their attorneys' fees and costs, including those incurred on appeal, from Bond.  Section 425.16, subdivision (c)(1) provides that "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs."  This includes fees on appeal.  (*Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1426.)  Accordingly, the Lillys are entitled to recover reasonable attorneys' fees, with the amount to be determined by the trial court on remand.

## DISPOSITION

The order denying the anti-SLAPP motion is reversed.  The Lillys shall recover their costs on appeal.  The matter is remanded to the trial court with instructions to enter an order granting the Lillys' anti-SLAPP motion and to

determine the appropriate amount of fees and costs to which the Lillys are entitled under section 425.16, subdivision (c)(1).


                                        BUCHANAN, Acting P. J.

WE CONCUR:


KELETY, J.


RUBIN, J.